CENTRAL UNION TRUST COMPANY OF NEW YORK, INDIVIDUALLY AND AS TRUSTEE, &c., *v.* GARVAN, AS ALIEN PROPERTY CUSTODIAN.

MERRILL ET AL., INDIVIDUALLY AND AS TRUSTEES, &c., *v.* SAME.

MARSHALL ET AL., AS TRUSTEES, &c., *v.* SAME.

MARSHALL ET AL., AS TRUSTEES, &c., *v.* SAME.

METROPOLITAN TRUST COMPANY OF THE CITY OF NEW YORK, TRUSTEE, &c., *v.* SAME.

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

Nos. 392–396. Argued January 10, 11, 1921.—Decided January 24, 1921.

1. Decrees of the Circuit Court of Appeals affirming decrees of the District Court, placing the Alien Property Custodian in possession of property in libel proceedings brought by him under the Trading with the Enemy Act, *held* reviewable in this court by writ of error. P. 566.
2. Congress has power in war time to provide for immediate seizure, *in pais* or through a court, of property supposed to belong to the enemy, leaving the question of enemy ownership *vel non* to be settled later at the suit of the claimant. P. 566.
3. Under § 17 of the Trading with the Enemy Act of October 6, 1917,

which confers on the District Court jurisdiction to make all such orders and decrees as may be necessary and proper to enforce the provisions of the act, those courts have jurisdiction to enforce the demands of the Alien Property Custodian for the delivery of property to the possession of which the act entitles him. P. 566.

4. The Trading with the Enemy Act, § 7 (c), provides that, "If the President shall so require, any money or other property . . . held . . . for the benefit of an enemy," without license, "which the President after investigation shall determine ; . . . is so held, shall be conveyed, transferred, assigned, delivered, or paid over to the alien property custodian." *Held*, that, upon a determination after investigation by the Custodian, exercising the President's power by delegation under § 5 of the act, that certain securities were held by trustees for the benefit of enemy insurance companies, followed by demand, the duty arose to deliver them to the Custodian; that the question of enemy property *vel non* could not be inquired into in his suit to compel delivery, but rights in that regard could be asserted and protected by claim, and if necessary suit, for return of the property, under § 9, as amended. P. 567

5. Proceedings of this character are alternative to direct seizure by the Custodian under § 7 (c) of the act as amended by the Act of November 4, 1918, and involve only the right to possession. P. 568. *Clinkenbeard* v. *United States*, 21 Wall. 65, distinguished.

6. In so far as concerns claimants who proceed as allowed by amended § 9, a proceeding like the present gives a mere preliminary custody, although in other respects the Custodian may get a conveyance under the act, with broad powers of management and disposition under § 12, as amended. P. 569.

265 Fed. Rep. 477; *id.* 481, affirmed.

THE cases are stated in the opinion.

*Mr. Perry D. Trafford* for plaintiffs in error in Nos. 392 and 393:

It is plain from the language of the Trading with the Enemy Act—and especially when the words selected are contrasted sharply with those proposed in the bill as originally introduced in Congress—that the property thereby directed to be transferred to the Alien Property Custodian is enemy property only.

The property which has been libeled is not enemy property but a trust fund, legally established, owned by an American citizen, and held by it primarily, if not wholly, for the benefit of American policyholders and creditors.

The very point involved has been passed upon by the courts in cases arising under the Confiscation Act of 1862, 12 Stat. 589, §§ 5 and 6. This act authorized the seizure "of all the estate and property, moneys, stocks and credits of" certain classes of persons. This is essentially the same as "any money or other property" of certain classes of persons in the Trading with the Enemy Act. *Day* v. *Micou,* 18 Wall. 156, 161; *In re Marcuard*, 20 Wall. 114, 115; *Burbank* v. *Conrad*, 96 U. S. 291, 293; *Conrad* v. *Waples*, 96 U. S. 279, 285.

Section 8 (a) of the Trading with the Enemy Act was not intended to enlarge the description contained in § 7 (c) of the property required to be transferred to the Custodian.

Even if the act should be construed as relating to all property which the Custodian after investigation may determine to be enemy property, yet, when he asks the aid of the court, and it appears upon the undisputed facts that he is not entitled as a matter of law to the relief he seeks, such relief should be denied. That a court of law will review the conclusion of an administrative officer upon admitted facts, and that such an officer cannot confer jurisdiction upon himself by his mistake as to the law, is settled by the authorities.

The amendment to § 7 (c) providing in substance that the sole remedy of any person having a claim to any property transferred to the Custodian shall be that provided by the terms of the act, refers to relief sought affirmatively by some person in relation to property which has passed into the actual or constructive possession of the Custodian. It is similar to the requirement that a receiver who has taken possession of property shall be sued only

in the court which appointed him. And the situation created by this amendment is not essentially different from that existing under our tax laws. *Clinkenbeard* v. *United States*, 21 Wall. 65.

Under any view the trustees are entitled to their day in court before they can be required to deliver the property from their possession to the Custodian.

*Mr. Emory R. Buckner*, with whom *Mr. Gerard C. Henderson* and *Mr. H. H. Nordlinger* were on the brief, for plaintiffs in error in Nos. 394 and 395:

The court may in this proceeding inquire whether the property was held for the benefit of an enemy, within the meaning of § 7 (c) of the Trading with the Enemy Act.

Enemy property may be of three kinds: (1) Property subject to capture at sea, (2) property subject to capture on land, and (3) property which cannot be captured at all, but which may with proper legislative authority be confiscated by appropriate legal proceedings. As for the occasion and effect of capture at sea and the necessity for subsequent judicial proceedings fully protecting the owner, see: *Lamar* v. *Browne*, 92 U. S. 187; *Manila Prize Cases*, 188 U. S. 254, 278; *Jecker* v. *Montgomery*, 13 How. 498, 516; Kent Comm., 13th ed., vol. 1, pp. 101, 102; *The Flad Oyen*, 1 C. Rob. 135; *Sawyer* v *Maine Ins. Co.*, 12 Massachusetts, 291, 295; *The Siren*, Fed. Cas. No. 12,911; *Bradstreet* v. *Neptune Ins. Co.*, 3 Sumner, 600; Moore's Digest, vol. 7, p. 630.

As to property on land, a sharp distinction is drawn between property subject to capture and property subject to confiscation. While the Constitution gives to Congress power to "make rules concerning captures on land and water," it is of course clear that without any legislation the military forces in the field have the power to capture any property in the hands of the hostile forces, or used or intended to be used for hostile purposes. *Kirk* v. *Lynd*,

558 OCTOBER TERM, 1920.

Argument for Plaintiffs in Error in Nos. 394, 395. 254 U. S.

106 U. S. 315, 317. There are only two requisites: (1) That the property be used or intended for hostile purposes, or peculiarly adapted to hostile use, and (2) that it be captured in the course of military activities. See *Mrs. Alexander's Cotton*, 2 Wall. 404; *Planters' Bank* v. *Union Bank*, 16 Wall. 483. The capture, "*flagrante bello*," of property used for hostile purposes has nothing to do with the ownership and involves no question upon which the courts can act. It rests upon military necessity. Hence, it is not surprising that with respect to movables the act of capture, immediately and without judicial proceedings, vests title in the government.

It follows as a corollary that no one, not even a loyal citizen or neutral, has redress in the courts for an unauthorized capture, unless Congress, as a matter of grace, grants a remedy. To permit suit against the military officers would hamper their conduct of military operations. *Lamar* v. *Browne, supra.* The government cannot be sued without its consent, and if there is no consent there is merely a wrong without a remedy.

In the Civil War, Congress granted a remedy under specific limitations. Abandoned Property Act of March 12, 1863, 12 Stat. 820; *United States* v. *Anderson*, 9 Wall. 56, 65; *United States* v. *Padelford*, 9 Wall. 531; Confiscation Act of August 6, 1861, 12 Stat. 319; *Kirk* v. *Lynd*, 106 U. S. 315; *Miller* v. *United States*, 11 Wall. 268.

In the case of property not taken *flagrante bello*, or by special legislative authority because used for hostile purposes, but property outside the field of hostilities, there is the right to confiscation because of its enemy ownership, under proper legislation. *Brown* v. *United States*, 8 Cranch, 109. But the Act of July 12, 1862, 12 Stat. 589, passed for this purpose, was sharply distinguished in the legal and constitutional theory upon which it was based, from either of the two acts previously considered. The Confiscation Act conferred on the Government a right

not previously existing. The Abandoned Property Act recognized an existing right in the Government, and conferred a remedy on certain persons injured thereby. "The one is penal, the other remedial; the one claims a right, the other concedes a privilege." *United States* v. *Anderson, supra.* The Abandoned Property Act covered only property in enemy territory, seized *flagrante bello* by the military authorities. *United States* v. *Padelford, supra; Planters' Bank* v. *Union Bank, supra.* The Confiscation Act covered only property in loyal States and did not authorize military seizure. *Planters' Bank* v. *Union Bank, supra.* The Abandoned Property Act recognized that title to hostile property captured by the military vested forthwith in the United States. The Confiscation Act recognized that property not captured by the military, and not affected by hostile use, could not be forfeited to the United States without legal proceedings. *United States* v. *Anderson, supra,* p. 66.

Equally significant is the distinction drawn by this court between the Confiscation Act of 1861 and the Confiscation Act of 1862. *Kirk* v. *Lynd, supra,* 319; *Bigelow* v. *Forrest,* 9 Wall. 339, 350; *United States* v. *Anderson, supra,* 67. When a military commander finds property used for hostile purposes he must act at once. He may seize the property and send it behind the lines; or he may destroy it on the spot. But where the only purpose is to cripple the enemy financially by confiscating his subjects' property, there is plenty of time for deliberate adjudication. There is no conceivable reason (aside from the natural impatience of executive officers with any judicial restraint upon their powers) why disputed questions of ownership should not be adjudicated, in an orderly way, before the seizure is complete. Custody of the property, throughout the proceedings, is in the court. Any decision may properly relate back to the date of capture. Every interest of the Government is fairly protected. And there

are preserved to the owners of property the inestimable benefits of due process of law.

The Trading with the Enemy Act should be examined in the light of these decisions.

The act as amended gives the Custodian more than a mere possessory right to enemy property seized by him. Immediately upon seizure, indeed upon mere require-ment that the property be transferred, the Custodian ac-quires the right to sell, for any reason satisfactory to himself, and to deal with the property "as though he were the absolute owner thereof." Such a right is not reconcilable with any theory of provisional custody. It is not like the Confiscation Act of 1862. The provisional seizure authorized in that act was open to collateral attack, and the determination upon which it was made was not binding on the courts. *Day* v. *Micou*, 18 Wall. 156, 161.

Nor is there the slightest analogy between the right of seizure conferred on the Custodian and the rights of tem-porary possession conferred upon a naval commander by capture. The naval commander, like the military officer, must act at once, upon appearances; the Custodian is under no such necessity. Moreover, the naval com-mander's right to possession is qualified by an absolute duty (which may yield only to imperious military neces-sity), to submit his rights to a court at the earliest possible opportunity. If he does not, he may lose the ship, even though the original capture was rightful. The Custodian is under no such duty of vindicating his right to possession after the property has been seized. The absence of such a safeguard argues strongly against the intention of Con-gress to confer upon the Custodian a right to take pos-session free from review by the courts. The right in the claimant to institute a suit under § 9 is of slight value in comparison.

The Custodian's determination, therefore, cannot be conclusive. *United States* v. *Anderson, supra; Jecker* v.

*Montgomery, supra.* There is a generic difference between executive decisions made in the course of administration, which incidentally affect personal or property rights, and decisions made in proceedings whose only object is the confiscation of property because of the nationality or conduct of the owner. *Lawton* v. *Steele*, 152 U. S. 133, 140; *Rockwell* v. *Nearing*, 35 N. Y. 302; *Dunn* v. *Burleigh*, 62 Maine, 24; *Lowry* v. *Rainwater*, 70 Missouri, 152. And the Custodian, being authorized to seize only enemy property, exceeds his jurisdiction, and his decision in any event is reviewable by the courts, if the property is in truth non-enemy. See *Burfenning* v. *Chicago &c. Ry. Co.*, 163 U. S. 321, 323.

Cases under the Confiscation Act of 1862 afford a parallel so close as to be decisive upon this point. *Bigelow* v. *Forrest*, 9 Wall. 339, 351; *Day* v. *Micou*, 18 Wall. 156, 161, 162; *Conrad* v. *Waples*, 96 U. S. 279; *Burbank* v. *Conrad*, 96 U. S. 291; *Waples* v. *United States*, 110 U. S. 630; *Avegno* v. *Schmidt*, 113 U. S. 293; *Shields* v. *Schiff*, 124 U. S. 351. Furthermore, the administrative decision can be conclusive only upon a question of fact. *American School of Magnetic Healing* v. *McAnnulty*, 187 U. S. 94, 109, 110; *Gegiow* v. *Uhl*, 239 U. S. 3.

Having invoked the jurisdiction of the court, libelant must make out a case according to law. [Citing *Clinkenbeard* v. *United States*, 21 Wall. 65, and many other cases.]

The property libeled is not enemy property. Legal title to it is vested in American trustees, for the benefit of American creditors and policyholders. It is therefore not subject to seizure under the Trading with the Enemy Act.

The constitutional basis of the act, as well as the manifest absurdity and gross injustice of any other construction, make it clear that, as a matter of substantive law, the act was intended to vest in the Custodian no more than the interest of the enemy, and this is demonstrated by its legislative history.

The decisions of this court in our own Civil War establish to a demonstration that the only rights vested in the Custodian by the Trading with the Enemy Act are the rights belonging to the enemy. *Day* v. *Micou, supra; In re Marcuard,* 20 Wall. 114; *Burbank* v. *Conrad, supra; Conrad* v. *Waples, supra; Avegno* v. *Schmidt, supra; Risley* v. *Phenix Bank,* 83 N. Y. 318; affd. 111 U. S. 125. See also decisions under the British trading with the enemy act: *In re Ruben* [1915], 2 Ch. 313.

*Mr. Walter F. Taylor* for plaintiff in error in No. 396.

*Mr. Lucien H. Boggs,* Special Assistant to the Attorney General, and *Mr. Assistant Attorney General Spellacy,* with whom *The Solicitor General* and *Mr. Dean Hill Stanley,* Special Assistant to the Attorney General, were on the briefs, for defendant in error:

The only issue is the right to possession of the securities. Questions of title are not involved, and the demand of the Alien Property Custodian, made pursuant to determination after investigation, is conclusive herein.

The general plan of the act has no direct precedent, the nearest analogy in American or English legislative enactment being the captured and abandoned property acts of the Civil War period. 12 Stat. 820. In the past, captures of property on land have, in the main, followed the practice applicable to capture of prizes at sea; and acts have provided, not for the taking possession and holding of property subject to future disposition, but for immediate condemnation by appropriate judicial proceedings. Under that procedure the seizure is merely a preliminary by which the property is brought within the jurisdiction of some court for judicial determination of its status as lawful prize, and for condemnation if found so to be. In fact, until the present war, the tendency for several hundred years had been away from the practice of

capturing and confiscating property of the enemy found on land. The remarkable development of international trade, commerce and investments which had taken place during the half century preceding this war, and the development of international credits, made necessary a change in this practice, if Germany was to be deprived during this war of the power to utilize for purchases in neutral countries credits based upon her investments in the allied countries. These countries, therefore, particularly England, France, Russia, and Italy, all passed legislation by which some public official, holding powers analogous to those of the Alien Property Custodian, was authorized to secure possession of enemy property, and, under certain circumstances, to liquidate enemy investments. No permanent confiscation of enemy property was decreed by any of these countries, the ultimate disposition of the property seized being left for future action.

The determination of enemy ownership made pursuant to the provisions of § 7 (c) is conclusive in so far as the Custodian's right to possession is concerned; and demands for the possession of property made by the Custodian pursuant to this section must be complied with and thereafter judicial determination had with respect to claims of ownership, as provided by § 9.

This feature of the act, although in some quarters assailed as radical and contrary to all the principles of the common law, is well justified by precedent. Since almost the beginning of our Government, it has been the law that all property taken or detained under authority of any revenue law of the United States shall be irrepleviable, and subject only to the orders and decrees of the United States courts having jurisdiction thereof. Rev. Stats., § 934. The validity of this provision has been sustained in every decision in which it has been called into question. *Treat* v. *Staples,* Fed. Cas. No. 14,162; *Brice* v. *Elliott,* Fed. Cas. No. 1,854; *DeLima* v. *Bidwell,* 182 U. S. 1, 180.

Similar legislation with respect to money collected for customs duties in excess of the amount really due has also been upheld. *Cary* v. *Curtis*, 3 How. 236; *Bartlett* v. *Kane*, 16 How. 263; *Arnson* v. *Murphy*, 109 U. S. 238; and requiring a taxpayer to pay a disputed tax and sue to recover. *Murray* v. *Hoboken Land Co.*, 18 How. 272; *Springer* v. *United States*, 102 U. S. 586; *Dodge* v. *Osborn*, 240 U. S. 118. Under the Abandoned Property Act of March 12, 1863, see *Haycraft* v. *United States*, 22 Wall. 81. See also *Barker* v. *Harvey*, 181 U. S. 481; *Botiller* v. *Dominguez*, 130 U. S. 238, 250; *Florida* v. *Furman*, 180 U. S. 402; *Moyer* v. *Peabody*, 212 U. S. 78; *Pacific Live Stock Co.* v. *Lewis*, 241 U. S. 440.

While the remedy under § 9 remains, in contemplation of law there is no possibility that a person rightfully entitled to property seized by the Custodian can be materially injured or deprived of property without due process of law.

The decisions so far rendered upon the Trading with the Enemy Act support this contention. *Salamandra Ins. Co.* v. *New York Life Ins. & Trust Co.*, 254 Fed. Rep. 852; *American Exchange Bank* v. *Palmer*, 256 Fed. Rep. 680 (later in effect overruled in the same case); *Keppelmann* v. *Keppelmann*, 89 N. J. Eq. 390, reversed 108 Atl. Rep. 432; *Garvan* v. *$6,000 Bonds*, 265 Fed. Rep. 481; *Biesantz* v. *Royal Arcanum*, 175 N. Y. S. 46; *Kahn* v. *Garvan*, 263 Fed. Rep. 909; *Kohn* v. *Kohn*, 264 Fed. Rep. 253, and other cases in the lower courts, unreported.

The answer sets up no facts sufficient to justify any exception in this case to the proposition under discussion.

The fact that the Custodian has resorted to the courts for the enforcement of his demand does not alter the construction of the act with respect to his right of possession. It would be a strange perversion of the law to place a premium upon disobedience to the clear mandates of a war statute by holding that when litigation ensues the

person who had disobeyed the law had by such diso-
bedience acquired greater rights than the person who had
complied with its requirements.

The facts set forth in the answers confirm the determina-
tion of the Custodian and justify his demand. They
establish, if true, that the securities libeled belonged to
or were held for the Munich Re-Insurance Company
within the purview of § 7 (c); that although policyholders
and creditors of that company within the United States
may have an interest in the nature of security therein,
such interest is not within the scope of § 8 (a); and there-
fore that the Custodian is entitled to possession of these
securities, leaving the protection of whatsoever rights
these creditors and policyholders, or these claimants on
their behalf, may have to the remedies provided by § 9.

MR. JUSTICE HOLMES delivered the opinion of the court.

These are libels brought by the Alien Property Cus-
todian under the Trading with the Enemy Act, October 6,
1917, c. 106, § 17, 40 Stat. 411, 425, to obtain possession
of securities in the hands of the plaintiffs in error re-
spectively as trustees. The libel in each case alleges that
the Alien Property Custodian after investigation deter-
mined that a German insurance company named was an
enemy not holding a license from the President, &c.; that
certain specified securities belonged to it or were held for
its benefit by the party now appearing as a plaintiff in
error in that case; and that a demand for the property
had been made but not complied with. The libellant
prayed an order directing the marshal to seize the prop-
erty and citing claimants of a right to possession to show
cause why the same should not be delivered to him. The
plaintiffs in error appeared as claimants in their several
cases, denied that the funds were held for the benefit of
an enemy, and set up the trust under which they held

them as required by the laws of Massachusetts or Connecticut for the security of American policyholders and creditors, with reasons for their right to retain the funds alleged in detail. The libellant moved for decrees for possession upon the pleadings which were granted by the District Court. The decrees were affirmed by the Circuit Court of Appeals, 265 Fed. Rep. 477; *ibid.*, 481. As the decision of the latter Court is not made final by the statute the cases have been brought on writ of error to this Court.

As is obvious from the statement of the pleadings the libels are brought upon the theory that these are purely possessory actions and that for the purposes of immediate possession the determination of the Enemy Property Custodian is conclusive, whether right or wrong. The claimants on the other hand set up substantive rights and seek to have it decided in these suits whether the funds are enemy property in fact and whether they have not the right to detain them. Strictly possessory actions still survive in the laws of some States and have been upheld, leaving the party claiming title to a subsequent suit. *Grant Timber & Manufacturing Co.* v. *Gray*, 236 U. S. 133. There can be no doubt that Congress has power to provide for an immediate seizure in war times of property supposed to belong to the enemy, as it could provide for an attachment or distraint, if adequate provision is made for a return in case of mistake. As it can authorize a seizure *in pais* it can authorize one through the help of a Court. The only questions are whether it has done so as supposed by the libellant and if so whether the conditions imposed by the act have been performed.

If the Custodian was entitled to demand the delivery of the property in question it does not seem to need argument to show that the demand could be enforced by the District Courts under § 17 of the act, giving to those Courts jurisdiction to make all such orders and decrees as may

be necessary and proper to enforce the provisions of the act. The first question then is whether the Custodian had the right to make the demand. By § 5 the President may exercise any power or authority conferred by the act through such officers as he may direct. It is admitted that he has exercised the powers material to these cases through the Enemy Property Custodian and by the Act of November 4, 1918, c. 201, 40 Stat. 1020, the Custodian is given the right to seize. By § 7 (c), as originally enacted, "If the President shall so require, any money or other property owing or belonging to or held for, by, on account of, or on behalf of, or for the benefit of an enemy or ally of an enemy not holding a license granted by the President hereunder, which the President after investigation shall determine is so owing or so belongs or is so held, shall be conveyed, transferred, assigned, delivered, or paid over to the alien property custodian." We are to take it therefore that the President has "so required," and that a case is made out under § 17 unless we are to consider the defences interposed.

If we look no further than § 7 (c), it is plain that obedience to the statute requires an immediate transfer in any case within its terms without awaiting a resort to the Courts. The occasion of the duty is a demand after a determination by the President and it is hard to give much meaning to the words "which the President after investigation shall determine is so  .  .  .  held" unless the determination and demand call the duty into being. The condition "after investigation" additionally points to the intent to make his act decisive upon the point, as it is in other cases mentioned in § 7 (a). But it is said that the subject of the section is enemy property only and therefore that the determination cannot be final in its effect. *Day* v. *Micou,* 18 Wall. 156. And it is true that it is not final against the claimant's rights. Upon surrender the claimant may at once file a claim under § 9; if he satisfies the representa-

tive of, the President may obtain a return, and, if he does not obtain it in sixty days after filing his application, or forthwith if he has given the required notice but filed no application to the President, may bring a suit to establish his rights in the District Court, in which case the property is to be retained by the Custodian until final decree. These provisions explain the initial words of § 7 (c) as saving the ultimate rights of the claimant while the determination of the President still may be given effect to carry out an immediate seizure for the security of the Government until the final decision upon the right. The reservation implies that mistakes may be made and assumes that the transfer will take place whether right or wrong.

The argument on the original words of the act in view of the manifest purpose seems to us to be strong, but it appears to us to be much strengthened by the amendments of later date. By the Act of November 4, 1918, c. 201, 40 Stat. 1020, § 7 (c) was amended among other things by adding after the requirements of transfer "or the same may be seized by the Alien Property Custodian; and all property thus acquired shall be held, administered and disposed of as elsewhere provided in this Act." This shows clearly enough the peremptory character of this first step. It cannot be supposed that a resort to the Courts is to be less immediately effective than a taking with the strong hand. *Clinkenbeard* v. *United States*, 21 Wall. 65, has no application. That was debt on a bond for a tax and turned on the right of the Government to the tax, not on possession. By a later paragraph "the sole relief and remedy of any person having any claim to any . . . property" transferred to the Custodian "or required so to be, or seized by him shall be that provided by the terms of this Act." The natural interpretation of this clause is that it refers to the remedies expressly provided, in this case by § 9; that property required to be transferred and property seized stand on the same footing, not that the resort by the Custodian

to the Courts instead of to force opens to the person who has declined to obey the order of the statute or who has prevented a seizure a right by implication to delay what the statute evidently means to accomplish at once.

To the conclusion that we reach it is objected that the Custodian gets a good deal more than bare possession—that the property is to be conveyed to him, and that by the Act of March 28, 1918, c. 28, 40 Stat. 459, 460, enlarging § 12, the Custodian "shall be vested with all of the powers of a common-law trustee in respect of all property, other than money, which has been or shall be, or which has been or shall be required to be, conveyed," &c., to him, and is given the power to sell and manage the same as though he were absolute owner. All this may be conceded if no claim is filed. But this act did not repeal § 9, which is amended by the later Acts of July 11, 1919, c. 6, 41 Stat. 35, and of June 5, 1920, c. 241, 41 Stat. 977, and as we have said, provides for immediate claim and suit and requires the property in cases of suit to be retained in the custody of the Alien Property Custodian or in the Treasury of the United States to abide the result. The present proceeding gives nothing but the preliminary custody such as would have been gained by seizure. It attaches the property to make sure that it is forthcoming if finally condemned and does no more.

*Decrees affirmed.*


THE CHIEF JUSTICE took no part in the consideration or decision of these cases.