### SIELCKEN–SCHWARZ v. AMERICAN FACTORS, Limited.

### ISENBERG v. SAME.

### Nos. 415, 416.

Circuit Court of Appeals, Second Circuit.
July 11, 1932.

Brainard Avery and Jay E. Whiting, both of New York City (Dean Hill Stanley, of Washington, D. C., and Albert G. Avery, of New York City, of counsel), for appellants.

Hughes, Schurman & Dwight, of New York City (Allen S. Hubbard and L. Homer Surbeck, both of New York City, and Alfred Sutro, W. H. Lawrence, and Eugene M. Prince, all of San Francisco, Cal., of counsel), for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

The bills in equity which the judge dismissed for insufficiency are alike. Each alleged that the plaintiff, a citizen of the United States, not domiciled in enemy territory, was a stockholder in a Hawaiian company, and that the alien property custodian wrongfully seized her shares on January 28, 1918, and had them issued in the name of a trust company as depositary for him. That on April 20, 1918, he voted upon them for a new board of directors, and in July, after the new board had so recommended, again voted, this time to sell the assets of the company to the defendant, a new company organized in Hawaii, in exchange for its shares. For such corporate action the laws of Hawaii required the unanimous consent of all the shareholders, so that the validity of the sale depended upon the custodian's power to vote. The new shares, when received, were to "be deemed to be of the approximate value of $7,500,000," and were transferred to voting trustees, who gave trust certificates in their stead, which the custodian received and held. The agreement also provided that these should be sold for $150, and this was done with the custodian's consent; his depositary thereupon dissolved the original company, though it has not wholly distributed the property or money received. While the bill alleges that the assets were worth more than $17,500,000, and were therefore sold "at a grossly inadequate consideration," it nowhere charges that the parties contrived a fraud; for all that appears they may have been honestly mistaken, and supposed that the transaction was to the advantage of the original shareholders. The prayer is that the defendant account to the plaintiff for the actual value of her wrongfully seized shares, and that she have judgment for the amount found due.

The only defect in the defendant's title is the putative invalidity of the custodian's vote; if he had power to act as the plaintiffs' surrogate, the shareholders unanimously approved the sale, and it was valid, however unwise. The argument is that as the seizure was wrongful, it could confer no such power; that the Trading with the Enemy Act (50 USCA Appendix § 1 et seq.) did not authorize the sale of non-enemy property, and it would not have been constitutional if it had. We may take it so. The power to seize, granted by section 7 (c) of the act (50 USCA Appendix § 7 (c), and note), was merely to gain possession, and for this reason the issue whether the property was enemy held, could be taken from the courts, and left with the custodian. Central Union Trust Co. v. Garvan, 254 U. S. 554, 41 S. Ct. 214, 65 L. Ed. 403; Commercial Trust Co. v. Miller, 262 U. S. 51, 43 S. Ct. 486, 67 L. Ed. 858. The case at bar involves the question as to what powers were made ancillary to that possession; more exactly whether the custodian might vote to dispose of the property.

That he had such power by the terms of the statute admits no doubt; whether it was valid if extended to the property of a citizen is another matter. Section 12, as amended by Act March 28, 1918, § 1 (50 USCA Appendix § 12)—before the custodian attempted to vote on the shares—not only gave him the powers of "a common-law trustee," which alone would have been enough, but explicitly provided that he should "in

addition thereto, * ⁙ ⁙ have power to manage such property and do any act or things in respect thereof or make any disposition thereof * * * by sale or otherwise, and exercise any rights or powers which may be or become appurtenant thereto ⁙ ⁙ ⁙ in like manner as though he were the absolute owner." There is not the slightest reason to suppose that this was intended to apply only to property which was in fact enemy held, and it would have been impossible to execute the purposes of the act if it had been. The custodian, having determined that the property was subject to the act, might never discover his mistake; the owner might not apply to any court, might apparently acquiesce in his decision. The property must meanwhile be protected; good occasions not be let slip; all sorts of action might be essential in the very interest of the owner.

As to its validity, it is not necessary to say whether Congress could have authorized the sale of a citizen's property, merely by giving him a claim to the proceeds. That might be too far to go merely to avoid difficulties of administration; though even this is perhaps not wholly free from doubt, for much may be done which is in fact in excess of a power, if it be essential to its effective exercise. At any rate we assume the issue arguendo with the plaintiffs. Congress made no such effort; it provided a complete remedy to the citizen whose property had been wrongly seized. He must surrender possession to be sure, but under section 9 of the act (50 USCA Appendix § 9) he might at once file a notice with the custodian reclaiming his property. This he might follow with an application to the President, and then he must wait sixty days for the President's action. But he need not do even this; upon the notice alone, if he chose not to apply, he might file a bill in equity at once "to establish the interest * * * so claimed, and if the suit shall be so instituted then the * * * property of the enemy or ally of enemy against whom such interest * * * is asserted ⁙ * * shall be retained in the custody of the alien property custodian * * ⁙ until any final judgment or decree * * * in favor of the claimant shall be fully satisfied." The phrase, "property of the enemy or ally of

enemy," is clearly equivalent to "property of the supposed enemy or ally of enemy," for the section was intended to relate only to a citizen or other person not an enemy. It would be preposterous to suppose that a citizen claiming redelivery of property of which he was the sole owner was in worse position than if he claimed merely an interest in property enemy owned in fact. The looseness of expression was corrected by the amendment to section 9 by Act June 5, 1920 (50 USCA Appendix § 9 note), but it was not necessary to do so, for a statute is always to be read to avoid substantial constitutional doubts. Already on November 4, 1918, the amendment to section 7 (c) had provided that upon a seizure the sole remedy should be "that provided by the terms of this Act." Section 9 was the only applicable provision, and to insure its validity, we construe it in the sense we have. We hold that it gave the plaintiffs immediate power on January 28, 1918, to impound their shares "in the custody" of the custodian till final decree. This conclusion was involved in the reasoning in Central Union Trust Co. v. Garvan, supra, 254 U. S. 554, page 569, 41 S. Ct. 214, 216, 65 L. Ed. 403. In reply to the argument that under section 12, as amended on March 28, 1918, the custodian might sell the property, and that therefore the seizure gave more than possession, the court answered that the amendment did not repeal section nine, whose effect was to stay any sale and leave the custodian with possession alone. See, also, Stohr v. Wallace (D. C.) 269 F. 827, 835, affirmed 255 U. S. 239, 243, 244, 41 S. Ct. 293, 65 L. Ed. 604. Section 12 was therefore valid and authorized the custodian's vote to dispose of the assets.

The other point requires little discussion. As all qualified shareholders voted for the exchange it made no difference that the boards of directors of both companies were the same. Speaking generally, the suits are excessively stale, the plaintiffs having waited thirteen years after the transaction was completed. While possibly this alone is not a bar, for conceivably the delay could be explained, still it leaves the suits in a very dubious light.

Decrees affirmed.