## CASTELL v. UNITED STATES.

District Court, S. D. New York.
July 20, 1937.

Albert G. Avery and Jay E. Whiting, both of New York City (Charles D. Hamel and John Enrietto, both of Washington, D. C., of counsel), for plaintiff.

Lamar Hardy, U. S. Atty., of New York City (Irvin C. Rutter, Asst. U. S. Atty., of New York City, of counsel), for the United States.

KNOX, District Judge.

This is a motion by plaintiff for summary judgment in an action against the United States to recover an alleged overpayment of taxes.

The papers submitted state the following facts: The will of Paul Isenberg, who died in 1903, bequeathed to his widow, Beta Isenberg, a fund of securities composed principally of stock in four Hawaiian sugar plantations. These securities were on deposit with H. Hackfield & Co., Ltd., an Hawaiian corporation, of which Paul Isenberg had been president. Some of the stock of the corporation composed a part of the fund. Pursuant to admonitions in the will, Mrs. Isenberg left the fund intact and maintained the deposit, using only the income for the support of herself and her dependents. Until the seizure, shortly to be discussed, the fund was disturbed only by accretions in the form of stock dividends; it was, at all times, treated as a trust fund. In 1917, the securities earned $104,000. On January 31, 1918, the Hawaiian representative of the Alien Property Custodian, invoking the Trading with the Enemy Act (50 U.S.C.A. Appendix § 1 et seq.), made a formal demand for the Hawaiian securites as property of an alien enemy, and on February 27, 1918, the securities were delivered to the representative's depositary.

Thereafter, the Alien Property Custodian sold all the securities at public auction, realizing the aggregate sum of $1,990,606.50. The Custodian invested a substantial portion of the proceeds in Liberty bonds, and deposited the entire account with the Treasurer of the United States under Alien Property Custodian Trust, No. 12611.

In 1923, Congress amended the Trading with the Enemy Act by providing that money and other property held by the Alien Property Custodian were subject to the revenue laws. The duty of paying all taxes theretofore or thereafter levied upon such property was imposed upon the Custodian. 42 Stat. 1516; 50 U.S.C.A. Appendix § 24

(a) and note. See 33 Op.Atty.Gen. 511 (1923). Thereupon, a deputy collector in the office of the collector of internal revenue prepared and filed an income tax return on behalf of Beta Isenberg. As part of the gross income, he included profits which, according to his calculation, amounted to $570,160.99 for 1919, and $71,836.50 for 1920, as taxable income arising out of the aforementioned public auction sale of the securities, and proceeded to apply to such profits the graduated tax and surtax rates prescribed in the Revenue Act of 1918 (40 Stat. 1057). The total tax amounted to $600,810.70 for 1919 and $17,142.69 for 1920. Subsequently, the Commissioner of Internal Revenue recomputed the tax and decided that Beta Isenberg had been overassessed $450,783.52 for 1919 and $2,204.81 for 1920. The stated amounts were accordingly refunded to the Alien Property Custodian, leaving balances of taxes paid of $150,027.18 for 1919 and $14,937.88 for 1920. In recomputing the taxes, the Commissioner concluded that the capital gain for 1919 had been $211,166.99 rather than $570,160.99, and $28,577.13 rather than $71,836.50 for 1920. Accordingly, he retained on account of these revised capital gains, only, and as part of the total tax, the amounts of $134,522.81 for 1919 and $10,126.92 as taxes. It is to recover these capital gains taxes that this suit is brought.

It should be stated here that during these tax transactions, Beta Isenberg had instituted a proceeding under section 9(a) of the Trading with the Enemy Act, as amended (50 U.S.C.A. Appendix § 9 and note), to recover all of the seized property or its proceeds. On February 20, 1926, the Supreme Court of the District of Columbia decided that Mrs. Isenberg was and had been an American citizen, and directed the Alien Property Custodian to return the property or its proceeds. Pursuant to this order, the Alien Property Custodian delivered to Mrs. Isenberg the proceeds, which did not include, of course, the aforementioned deductions for 1919 and 1920 taxes. The principal fund, as returned, was deposited with the Chase National Bank of the City of New York to be invested in a selected group of securities suitable for investment by a fiduciary, and which was designed to replace the original investment fund held by H. Hackfield & Co., Ltd. Such investments were duly made.

In 1928 Congress enacted the Settlement of War Claims Act, as a result of which the Trading with the Enemy Act underwent

drastic amendment. Section 18 of the Settlement of War Claims Act (50 U.S.C.A. Appendix § 24) renumbered section 24 of the Trading with the Enemy Act to be section 24(a) and added sections 24(b) to 24(f). Sections 24(c) and 24(d) provide as follows:

"(c) So much of the net income of a taxpayer for the taxable year 1917, or any succeeding taxable year, as represents the gain derived from the sale or exchange by the Alien Property Custodian of any property conveyed, transferred, assigned, delivered, or paid to him, or seized by him, may at the option of the taxpayer be segregated from the net income and separately taxed at the rate of 30 per centum. This subsection shall be applied and the amount of net income to be so segregated shall be determined, under regulations prescribed by the Commissioner of Internal Revenue with the approval of the Secretary of the Treasury, as nearly as may be in the same manner as provided in section 208 of the Revenue Act of 1926 (relating to capital net gains), but without regard to the period for which the property was held by the Alien Property Custodian before its sale or exchange, and whether or not the taxpayer is an individual.

"(d) Any property sold or exchanged by the Alien Property Custodian (whether before or after the date of the enactment of the Settlement of War Claims Act of 1928) shall be considered as having been compulsorily or involuntarily converted, within the meaning of the income, excess-profits, and war-profits tax laws and regulations; and the provisions of such laws and regulations relating to such a conversion shall (under regulations prescribed by the Commissioner of Internal Revenue with the approval of the Secretary of the Treasury) apply in the case of the proceeds of such sale or exchange. For the purpose of determining whether the proceeds of such conversion have been expended within such time as will entitle the taxpayer to the benefits of such laws and regulations relating to such a conversion, the date of the return of the proceeds to the person entitled thereto shall be considered as the date of the conversion."

Within the required period, Beta Isenberg began this suit to recover the amounts of $134,522.81 and $10,126.92, which, as heretofore stated, had been assessed against the seized property for capital gains taxes.

The complaint alleges two causes of action: The first under section 24(c) for the excess above 30 percent; the second under section 24(d) for all taxes deducted as a levy on the gain arising out of the forced sale.

In arguing in opposition to the instant motions, the United States contends that the Settlement of War Claims Act applies exclusively to the property of alien enemies, and not to the claim of an American citizen. To support its proposition the government relies primarily on Castell v. United States (Ct.Cl.) 14 F.Supp. 654, another suit between the present parties, which in turn follows Escher v. Woods, 281 U.S. 379, 50 S.Ct. 337, 338, 74 L.Ed. 918, decided after the enactment of the 1928 act. In the latter case, suit was brought by a friendly alien to recover property erroneously seized by the Alien Property Custodian. Although plaintiff recovered the property, certain deductions were claimed by the Alien Property Custodian. These deductions represented an assessment of two percent of the assets handed over as a charge for administration expense. To justify the use of a flat rate as a method of calculating the burden to be borne by the property seized, the Custodian relied upon the Trading with the Enemy Act, Executive Orders, and particularly the Act of March 4, 1923, § 2, which added section 24[1] to the original Trading with the Enemy Act. Section 24 authorized the Alien Property Custodian to deduct the "necessary expenses incurred by him * * * in securing possession * * * of any such money * * * or in protecting or administering the same."

The Supreme Court decided that the plaintiff, a friendly alien, could recover the deductions made by reason of the flat rate. Mr. Justice Holmes said: "We do not perceive even in 1928 anything that clearly suggests treating the property in the hands of the Custodian as one great trust, to be called on to bear the expenses of administration, as one homogeneous whole. On the contrary the directions are explicit that the expenses charged to a given property are those incurred in getting or protecting it." In other words, the statute does not authorize the use of a flat rate having no direct relation to the actual expenses incurred in seizing and holding specific property. On the contrary, the statute directs that only such outlays as the Alien Property Custodian actually makes in seizing and holding particular property may be assessed against that

---

[1] Now section 24 (a), 50 U.S.C.A. Appendix.

property. Immediately thereafter Mr. Justice Holmes asserted: "But, and this is the main thing, all of these provisions naturally are interpreted to refer to property that the Custodian is entitled to hold. It would be extraordinary if the charges incident to a seizure that the law did not intend the Custodian to make and a possession that the law requires him to surrender, were to be imposed upon the owner whose interests were sacrificed up to the moment of restitution. It seems to be going far enough to require him to bear the loss that he has suffered, without compelling him to pay the Government for its outlay in doing him harm."

In Castell v. United States, supra, the plaintiff sued to recover interest on an over-assessment of 1917 taxes. The Government by way of defense set up section 24(e) of the Trading with the Enemy Act, as added by section 18 of the Settlement of War Claims Act, which provides, in part, that no interest shall "be credited or paid to the taxpayer in respect of any credit or refund allowed or made in respect of such tax." Plaintiff contended that this section did not apply to American citizens. Thus the parties adopted positions directly opposite to those taken in the case at bar. The Court of Claims decided in the plaintiff's favor, holding that the prohibition in section 24(e) applies only to alien enemies and not to American citizens. In reaching this conclusion, the court apparently relied entirely upon the last-quoted dictum of Mr. Justice Holmes. In view of the rulings that section 24(a) and section 24(e) are not applicable to nonenemies, the Government now argues that sections 24(c) and 24(d) are likewise inapplicable.

However, I am not satisfied that the Court of Claims' interpretation of Mr. Justice Holmes' dictum is altogether accurate, or that I can follow its conclusion. As I read that dictum, it declares that the provision authorizing deductions is operative only against property which has been properly seized; in other words, that a suit to recover deductions properly applicable to other trusts might be maintained or, as the Supreme Court has stated, in its own interpretation of Escher v. Woods, "the unlawfulness of the charges made by the Custodian against the proceeds of sale of nonenemy owned property is open to judicial inquiry." Becker Steel Company v. Cummings, 296 U.S. 74, 82, 56 S.Ct. 15, 19, 80 L.Ed. 54. Thus, as I interpret section 24(a),

in the light of the decisions of the Supreme Court: (1) Assessments by the Alien Property Custodian are limited to the expenses actually incurred as to the specific property. (2) Whether such charges have been properly assessed against property erroneously taken is open to judicial inquiry, see Becker Steel Company v. Cummings, supra, and it has been held that such deductions, if in accord with the statute, may be made. Kuttroff v. Sutherland (D.C.) 49 F.(2d) 944. (3) The mere institution of a suit or filing of a claim as to property erroneously seized does not of itself halt the charging against that property of the expenses of seizure and retention. Such a rationale of the dictum and the statute is in complete harmony with the provisions of the statute expressly referring to suits to recover property, since at the time section 24(a) was enacted, such suits could be brought only by nonenemies. On the other hand, the force given by the Court of Claims to Mr. Justice Holmes' language leads to interpretations expressly contrary to the terms of the statute. I am, therefore, of the opinion that section 24 does apply to all legal acts of the Alien Property Custodian regardless of the citizenship of the owner of the property affected and that the determination of what acts are lawful is presently a judicial problem. That is, in so far as the Alien Property Custodian's acts were authorized by the law and the Constitution of the United States, section 24 is to be applied to all property seized.

It is well settled that Congress could and did authorize the Alien Property Custodian to seize any property, although such property might ultimately be shown to belong to a nonenemy. Central Union Trust Co. v. Garvan, 254 U.S. 554, 41 S.Ct. 214, 65 L.Ed. 403; Stoehr v. Wallace, 255 U.S. 239, 41 S.Ct. 293, 65 L.Ed. 604. Furthermore, section 12 of the Trading with the Enemy Act, as amended (50 U.S.C.A. Appendix § 12), authorizing the sale of seized property, has been declared valid. Sielcken-Schwarz v. American Factors (C.C.A.) 60 F.(2d) 43; cf. Becker Steel Co. v. Cummings, supra, at page 80, of 296 U.S., 56 S. Ct. 15, 80 L.Ed. 54. In any event, the power of sale is not disputed here. Since the sale was valid, I am satisfied that the plaintiff comes within sections 24(c) and 24(d) at least to the extent that he may properly try to invoke whatever therein may be favorable to him. Therefore, as a minimum, plaintiff is entitled to judgment for

the benefits sought under section 24(c). Whether he may recover the larger amount sought in the second cause of action will now be considered.

▌ Pursuant to section 24(d), the Commissioner of Internal Revenue promulgated regulations, see Cum.Bul. VII–2, 413, of which Article VII(a) provides: "(a) Computation of tax. In the case of any property sold or exchanged by the Alien Property Custodian, no gain or loss shall be recognized, for the purposes of the income, war-profits, and excess-profits tax laws, if the owner of the property thus sold or exchanged, forthwith upon the return of the proceeds (or such part thereof as is returned) of the sale or exchange to him, in good faith expends such proceeds in the acquisition of other property similar or related in service or use to the property sold or exchanged."

That the new securities were acquired by Mrs. Isenberg "forthwith" and "in good faith" is not disputed here; the only issue is whether the new securities constitute "other property similar or related in service or use to the property sold."

At the time of its seizure, the property consisted of stock in four Hawaiian sugar plantations and in H. Hackfield & Co., Ltd., sugar factors. From the death of Paul Isenberg in 1903 until its seizure in 1918, the corpus of the fund of securities, as previously shown, was not disturbed; it was treated as a trust fund for Mrs. Isenberg and her dependents. Upon recovery in 1926, the proceeds were converted into investments of such corporate bonds, stocks, and governmental obligations as would be of sufficient yield and suitable character to produce a steady and assured annual income comparable to that produced by the fund prior to its seizure. The new property was to serve the purposes served by the original fund.

The Government contends, nevertheless, that the benefits of section 24(d) are unavailable to plaintiff to the extent that the nature of the property underlying the new securities is not "similar or related in service or use" to sugar plantations. I am of opinion that as applied to the case at bar the Government's interpretation of the phrase is too narrow. True, the phrase may not be satisfied by a test of whether the new property is merely income-producing, see GCM 14693, C.B. XIV–1,197, but the test advanced by the Government that the similarity required is in the nature of the property so that, e. g., a jute mill, must be replaced by property related to jute mills is too formalistic, although if such a formal course be followed, it would be relatively easy to apply and would save courts much travail. While most people who put their resources into an enterprise, (even though it be the most modest business), do so by way of "investment," we know that the conversion of money into securities with a view to obtaining safety of principal and continuity of income has become a distinct type of property ownership. By this means, such persons hope that their accumulations will be free of many of the hazards that so frequently attach themselves to other forms of investment. This is not to say that there is no plausibility to the Government's suggestion that whether property is acquired or held for investment purposes may be an inquiry relying too heavily upon subjective standards. On the other hand, where the extrinsic evidence is as clear as in the case at bar, relief should not be denied.

In Commissioner v. Greene, 42 F.(2d) 852, 853 (C.C.A.2d), the trustees under a will disposed of 5,534 of Eastman Kodak Company shares held by them as a part of the corpus of the trust and reinvested the proceeds in state, municipal, and railway bonds. The issue before the court was whether the new property was of "like kind or use." On this the court said: "If of like 'kind' and 'use,' no gain is to be recognized in the exchange under the statute. The 'use' of the property exchanged was the same as that obtained and made part of the corpus of the trust—it was for investment. The properties, stock for bonds, are of 'like kind.' "

Manifestly the phrase "similar or related in service of use" should be no narrower in application than the phrase construed in the Greene Case. On the contrary, since the phrase before me has been used in involuntary conversions, i. e., conversions not within the control of the owner, it is to be expected that more lenient standards be applied than in the case of voluntary conversions. Moreover, the word "similar" is merely a synonym for the word "like." Thus, I am of opinion that the new investments made by Mrs. Isenberg were "similar or related in service or use" to the property seized; more specifically, related in use. Therefore, plaintiff should recover whatever benefits may accrue by virtue of section 24(d). Furthermore, I have decided to adhere to my previous decision on the

180

Government's motion predicated on the alleged waiver.

However, plaintiff is not entitled to recover interest on the award. Section 24(e) prohibits the levying of interest, and in accordance with my analysis of Escher v. Woods, supra, I have concluded that section 24(e) is applicable to the plaintiff herein. See Henkels v. Sutherland, 271 U.S. 298, 46 S.Ct. 524, 70 L.Ed. 953, 51 A.L.R. 229; Castell v. United States, supra.