[Civ. No. 14737. First Dist., Div. Two. Oct. 25, 1951.]

Estate of DOMENICO STAGNARO, Deceased. J. HOWARD McGRATH, as Attorney General of the United States, etc., Appellant, v. WALTER C. COX, as Partial Assignee of Certain Heirs, etc., et al., Respondents.

Harold I. Baynton, Assistant Attorney General of United States, Director, Office of Alien Property, Chauncey F. Tramutolo, United States Attorney, Valentine C. Hammack, Myron D. Alexander, Special Assistants to Attorney General of United States, Thomas H. Creighton, Jr., George B. Searls and Joseph Laufer, Attorneys, Department of Justice, for Appellant.

J. A. Pardini, Elda Granelli, Mana & Mana, Elkins & Wright and F. Campagnoli for Respondents.

GOODELL, J.—This appeal was taken by the Attorney General of the United States, as successor of the Alien Property Custodian, from a part of the decree of final distribution in this estate.

Domenico Stagnaro, a resident of San Francisco, died intestate on December 22, 1944, leaving an estate valued at upwards of $25,000.

On January 3, 1946, the Alien Property Custodian, acting under the Trading with the Enemy Act, made a vesting order which embraced the right, title and interest of all the heirs in the estate excepting one. At the hearing on final distribution the United States Attorney presented the vesting order and asserted thereunder the right of the government to have the shares of 30 of the 31 heirs distributed to the Office of

Alien Property. The court entered a decree distributing the shares of 28 of the 31 to the heirs themselves in the usual way and those of the other three, who resided in Italy, to the Office of Alien Property.

Nineteen of the heirs are kindred of decedent, and the other 12 are kindred of his wife, Celestina, who predeceased him. A piece of real property which came to decedent through his wife was sold in probate and the proceeds were available for distribution. The derivation of this property brought into operation the provisions of section 229 of the Probate Code "to turn the property back to the family from which it came" (*Estate of Putnam*, 219 Cal. 608, 611 [28 P.2d 27]) and accordingly this money, representing the land, was distributed to Celestina's collateral relatives. They took, of course, as "heirs of the decedent . . . widower, not as heirs of the predeceased spouse" (*Estate of Watts*, 179 Cal. 20, 23 [175 P. 415] ; *Estate of Marshall*, 42 Cal.App. 683, 686 [184 P. 43]). Three of Celestina's kindred resided in Italy and the court distributed their shares to the Office of Alien Property. The other nine resided in California and the court distributed their shares to them in the usual way. The attorney general did not appeal from that part of the decree.

The appeal is taken from that part of the decree which distributes—

"To the following heirs of Domenico Stagnaro, deceased, who are all first cousins of said decedent, the sum of $9,314.01 less one half (½) of the extraordinary compensation allowed by Court in the following proportions, towit:

"To Walter C. Cox, twenty (20) per cent of the distributive share of the following named heirs, in accordance with the assignments executed by them and approved herein, towit:" Here follow the names and residences of the 15 heirs who had assigned (nine living in Italy, five in Chile and one in France) and the four who had not assigned (three living in San Francisco and one in San Diego).

The only persons whose names were set forth in the vesting order were Letterina Carniglia Bisio, Lorenzina Carniglia and Giobatta Carniglia, residents of Italy, and respondent Rose Brusco, a resident of San Francisco. After vesting the interests of the three Italian residents the order proceeds to blanket in all the other heirs, except Rose Brusco, as follows:

"Heirs, names unknown, of Domenico Stagnaro, also known as Domenic Stagnaro, deceased, except Rose Brusco, a resident of the United States. . . . And determining that to the extent

that such nationals are persons not within a designated enemy country, the national interest of the United States requires that such persons be treated as nationals of a designated enemy country, (Italy) ;''

Appellant contends that all the right, title and interest of all these 19 heirs became effectively vested in the Custodian by the vesting order and that the court was bound to distribute their respective shares to the Office of Alien Property (just as it did the shares of the three Italian residents).

Respondents argue that ''The custodian did not determine in the case at issue that any particular heir is an enemy or that the national interest of the United States required that any particular person be treated as a national of a designated enemy country, nor did he determine that any specific property be turned over to the Alien Property Custodian and such determinations are prerequisites to vesting and seizure.''

■ The vesting order was the initial step and a ''condition precedent to a valid seizure'' (*Isenberg* v. *Sherman*, 212 Cal. 454, 500 [298 P. 1004, 299 P. 528]). It was made, as was said in *Stoehr* v. *Wallace*, 255 U.S. 239 [41 S.Ct. 293, 65 L.Ed. 604], ''in virtue of a determination by an executive officer in an *ex parte* administrative proceeding.''

In the nature of things the vesting order could not have specified all the heirs or defined their interests with particularity. It is self-evident that the quantum of interest of any one heir could not be determined until the identity of all the heirs was determined, since the size of the distributable share of each depended upon the total number entitled to inherit, and such questions could not be settled until the time came for distribution.

At the time when the custodian made the vesting order the estate's attorneys had reported to him the names of no more than three heirs in Italy and 10 in California. Four years later, on distribution, it turned out that instead of only 13, there were as many as 31 heirs. In fact it was stated at the hearing that ''some of the heirs were not discovered until a month ago.''

■ There was nothing irregular or unusual about the language of the vesting order, viz., ''Heirs, *names unknown*, of Domenico Stagnaro . . .'' since ''The decedent died intestate, and upon his death title to the property became vested in his heirs (Prob. Code, sec. 300) *whether such heirs were known or unknown.*'' (*Johns* v. *Scobie*, 12 Cal.2d 618, 623

[86 P.2d 820, 121 A.L.R. 1404], citing *State* v. *Miller,* 149 Cal. 208 [85 P. 609].) (Italics added.)

Respondents complain that the vesting order treated all the 19 heirs as if they were residents of Italy without having ascertained that they were. It reads: "Under the authority of the Trading with the Enemy Act . . . and pursuant to law, the undersigned, *after investigation, finding;* . . . *And determining* that to the extent that such nationals are persons not within a designated enemy country, the national interest of the United States requires that such persons be treated as nationals of a designated enemy country, (Italy) ;" (italics added).

Respondents' attack on the order (made for the first time on appeal) is not well founded. The power of the Custodian to make such a determination (even though made ex parte) has been repeatedly upheld. In *Central Union Trust Co.* v. *Garvan,* 254 U.S. 554 [41 S.Ct. 214, 65 L.Ed. 403], the Custodian filed libels to obtain possession of securities, alleging that *after investigation he had determined that a certain German insurance company was an enemy* and that such securities were either its property or held by it as trustee. The claimants denied that the property was held for the benefit of an enemy, set up the trust under which they held it, alleged in detail the reasons for their right to retain it, and sought to have it decided *in the possessory actions* whether the property was enemy property in fact. The custodian moved *on the pleadings* for decrees ordering the marshal to seize the property, contending that "for the purposes of immediate possession, the determination of the . . . Custodian is conclusive, whether right or wrong." In sustaining that contention the court said: "There can be no doubt that Congress has power to provide for an immediate seizure in war times of property supposed to belong to the enemy, as it could provide for an attachment or distraint, if adequate provision is made for a return in case of mistake. As it can authorize a seizure in pais, it can authorize one through the help of a court." Again: "It cannot be supposed that a resort to the courts is to be less immediately effective than a taking with the strong hand." And again: "The present proceeding gives nothing but the preliminary custody, such as would have been gained by seizure. It attaches the property to make sure that it is forthcoming if finally condemned, and does no more."

In *Stoehr* v. *Wallace,* 255 U.S. 239 [41 S.Ct. 293, 65 L.Ed. 604], a somewhat similar question was presented. The custo-

dian's ex parte determination of enemy ownership was attacked on the ground that it had been arrived at, and certain shares taken, without first according the claimant a hearing in a court of justice. In holding the claimant's position untenable the court, after citing the Garvan case, *supra,* said: "There is no warrant for saying that the enemy ownership must be determined judicially before the property can be seized; *and the practice has been the other way.* The present act commits the determination of that question to the President, or the representative through whom he acts, but it does not make his action final. On the contrary, it distinctly reserves to any claimant who is neither an enemy nor an ally of an enemy a right to assert and establish his claim by a suit in equity unembarrassed by the precedent executive determination. Not only so, but, pending the suit, *which the claimant may bring as promptly after the seizure as he chooses,* the property is to be retained by the Custodian to abide the result, and, if the claimant prevails, is to be forthwith returned to him. Thus there is provision for the return of property mistakenly sequestered; and we have no hesitation in pronouncing it adequate, for it enables the claimant, as of right, to obtain a full hearing on his claim in a court having power to enforce it if found meritorious." (Italics added.)

In *Commercial Trust Co. of New Jersey* v. *Miller,* 262 U.S. 51 [43 S.Ct. 486, 67 L.Ed. 858], the court says of the Garvan and Stoehr cases: "They decide . . . that the determination of the custodian is conclusive, whether right or wrong."

*Hunter* v. *Central Union Trust Co.,* 17 F.2d 174, relied on by respondents is not in point since there the demand which the Custodian made on the trust company contained no administrative determination such as those discussed in the Garvan, Stoehr and Miller cases, and such as there was in this case. Instead, it delegated to the trust company the duty of ascertaining whether the certificates were owned or held by enemy aliens.

*In re Blau's Estate,* 4 N.J.Super. 343 [67 A.2d 316] is not in point. There the vesting order embraced 12/31 of the estate, while here by the language "Heirs, names unknown" the order embraced all the interests of all the heirs. If when the court there said that the custodian "could not vest in himself, by a vesting order, specific interests in the estate" it meant that it was not possible for the custodian in a case such as the present one to descend into fractions in his vesting order until the probate court had itself determined just what

the fractional parts were, we agree with it, as appears from what we have said earlier. But the court's language is very broad. If it means that the custodian cannot make a vesting order such as the omnibus one in this case until the probate court by its decree of distribution definitively divides the estate up into fractional parts, we by no means agree with it.

■ The Trading with the Enemy Act does not prescribe any particular mode of seizure (*Isenberg* v. *Sherman, supra,* 212 Cal. 454, 500). However, when the United States Attorney appeared at the hearing, armed with the vesting order, and asserted the government's right to distribution, he was doing everything within his power toward effecting a seizure. The probate court was the proper forum, and the action was timely since the court was then engaged in distributing the estate. It was the duty of the court to distribute the 19 shares to the Office of Alien Property as it did the shares of the three residents of Italy.

That part of the decree from which the appeal was taken is reversed.

Nourse, P. J., concurred.

DOOLING, J.—I concur. The respondents' argument, as I understand it, is that the determination that persons whose names are unknown are nationals of Italy etc. is no real determination at all. "How," respondents say in effect, "can the Custodian validly determine without knowing who the heirs are, or even how many, that they are Italian nationals?" The argument is impressive, but it is only valid if we can say that under no circumstances could such a determination be reasonably made. The act places the power of determination in the President or his nominee, the custodian. It assumes that he may make mistakes in his determination and hence allows for relief from such mistakes by section 9. (*Central Union Trust Co.* v. *Garvan,* 254 U.S. 554, 567-568 [41 S.Ct. 214, 65 L.Ed. 403].) "The reservation," says Justice Holmes, speaking for the court in that case, "implies that mistakes may be made and assumes that the transfer will take place whether right or wrong."

I assume that the custodian in making such determinations is entitled to act on reasonable probabilities as are courts in civil actions. I cannot say that under no circumstances could the custodian determine that it was reasonably probable that

the unknown heirs of an Italian decedent were nationals of Italy. If he has the power to make such a determination that is the end of this case.

A petition for a rehearing was denied November 24, 1951.