United States of America *v.* Board of Finance
and Revenue, Appellant.

Argued October 2, 1951. Before DREW, C. J., STERN, STEARNE, JONES, BELL, LADNER and CHIDSEY, JJ.

reargument refused February 14, 1952.

*Harry F. Stambaugh,* Special Counsel, with him *Robert E. Woodside, Jr.,* Attorney General, for appellant.

*Irwin A. Seibel,* Attorney, Department of Justice, with him *Harold I. Baynton,* Assistant Attorney General, *Arthur A. Maguire,* United States Attorney, *James D. Hill* and *George B. Searls,* Attorneys, Department of

Justice, and *Thomas Wood, Jr.,* Assistant United States Attorney, for appellee.

Opinion by Mr. Justice Ladner, December 27, 1951:

The Commonwealth of Pennsylvania appeals from the order of the Dauphin County Court (see 61 Dauphin 127) reversing the Board of Finance and Revenue's refusal of the claim of J. Howard McGrath, Attorney General of the United States, as successor to the Alien Property Custodian for the sum of $16,280.37, paid into the State Treasury without escheat, under an award of the Orphans' Court of Philadelphia, made because of the absence of known next of kin.

The claim was denied because of the failure of the U. S. custodian to offer any proof that any next of kin existed who were enemy nationals or resided in any enemy country. The custodian takes the position that he need produce no proof and stands on the extreme proposition that he may by an administrative fiat seize money in a State Treasury by merely declaring it to be the property of unnamed, unidentified and perhaps nonexistent enemy heirs. The court below conceded that by such declaration alone the custodian might interfere with the state's constitutionally guaranteed right to exercise its control over the devolution of property within its borders. The implications of such a ruling are most serious and, affecting as it does the sovereignty of a state, must be carefully examined.

Historians have repeatedly asserted that the proud freedom of the individual American citizen has in no small measure been due to our dual form of government "which had no parallel in political history."[1] Originally the Federal Government was framed as and

---

[1] Introduction of Mr. Justice Roberts' "Oliver Wendell Holmes Lecture," Harvard 1951.

intended to be one of limited specified powers; the Constitution so declares. It would never have been ratified by the requisite number of states if it had not been for the pledge made to append a Bill of Rights and to expressly guarantee (what Madison said was implied) that "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." This guarantee became the important 10th Amendment. Step by step we have seen the Federal Government invade the prerogatives of the states through the doctrine of implied powers, but never has it been thought possible that money left by a resident decedent awarded to the State Treasury in absence of known heirs, was subject to seizure by a mere say so of an administrative official without a shred of proof to justify such action.

The proposition becomes more astonishing when the facts are examined. Mary Zuercher died May 31, 1944, an admitted resident of Pennsylvania. Her estate of approximately $16,000 passed into the possession of her administrator. A vesting order on behalf of the Alien Property Custodian was served on the administrator by which he vested in himself "*all the right title and interest* of heirs and next of kin, names unknown, of Mary Zuercher, last known address Germany." It will be observed this vesting order while it designated no *known* heirs or *next of kin* alleged to be enemy nationals, nevertheless operated to protect fully the Federal Government in its undisputed right to prevent the money from getting into an enemy country. This vesting order was effective and yet respected the prerogative of the state courts to determine if there were or who were the heirs of the estate pending therein. When the estate was called for audit May 9, 1945, before Judge KLEIN of the Philadelphia Orphans' Court which had jurisdiction, the administrator reported his in-

ability to locate *any* next of kin *here or elsewhere,* whereupon the attorney for the Commonwealth asked that the balance for distribution be paid into the State Treasury without escheat under provisions of Sec. 1314 of The Fiscal Code.[2] The attorney representing the Alien Property Custodian stated to the court that he had the authority of the United States Attorney General to say, *"If there is an award to the Commonwealth, without escheat, there will be no objection."* This could only mean one thing, namely that the government wished more time to determine if there were any heirs and if so to locate them. Accordingly the balance was so awarded and the money paid into the Commonwealth's Treasury. This was a proper orderly procedure and recognized the State's right guaranteed by the 10th Amendment to determine the parties entitled to inherit property of resident decedents. The Alien Property Custodian had by that entirely proper vesting order substituted himself for any German or enemy nationals whom he might find or who might later appear and

---

[2] The Commonwealth, under the law of Pennsylvania as it then stood could at its option pursue any one of three methods to acquire unclaimed or escheatable property: (1) it could proceed under provisions of the Act of May 2, 1889, P. L. 66, 27 P.S. 1 et seq., to escheat the funds and obtain title thereto (2) it could claim pursuant to Sec. 1314 of The Fiscal Code of April 9, 1929, P. L. 343, 72 P.S. 1314, the custody and possession but not title to the fund (3) it could proceed under Section 24 of the Intestate Act of June 7, 1917, P. L. 429, as amended, 20 P.S. 137, to have the proceeds of a decedent's property paid into the treasury for the use of the Commonwealth. The first and last vest title in the Commonwealth, the second custody and possession subject to reclamation by one presenting proofs of better title. See review of this subject in *Rhodes & Hannebauer Estates,* 71 D. & C. 330 (1950) ; see also *Girard Trust Co.-Commonwealth Appeal,* 367 Pa. 223, 226, 79 A. 2d 666 (1951). Money paid into the State Treasury may nevertheless at some future time be escheated so as to give title to the Commonwealth.

claim to be next of kin. The Federal Government was thereby assured of full protection against that eventuality and the Commonwealth's sovereign right at the same time respected.

However, not content with the protection thus achieved and contrary to his acquiescence to the court's award, the Alien Property Custodian later under date of August 21, 1945, filed a *new* vesting order which he called a supplemental vesting order. The new order instead of claiming the *right title and interest* of any German heirs, now claimed *the specific fund* of $16,-279.77 theretofore paid into the treasury of the state and of course commingled with other state funds. That new vesting order declared said sum "payable . . . to . . . or owing to . . . nationals of a designated enemy country, Germany, namely, Nationals: Heirs-at-law and next-of-kin, names unknown, of Mary Zuercher, deceased. Last Known Address: Germany" Upon filing this new order the sum claimed was demanded of the State Treasurer, though money once paid into the State Treasury can only be paid out in the manner provided by the Constitution and statutes of the Commonwealth.

It was argued before us that under the "war power" the custodian by such mere declaration, without any showing that such heirs in fact exist or ever existed, may now compel the State to make payment to him. It was even argued by the learned counsel for the government that this power of the custodian is so absolute that if the fund had actually been escheated to the Commonwealth he might even set that escheat aside by his mere demand. That is to say, that even if the alleged heirs were but a figment of imagination, the sovereign State of Pennsylvania would be concluded by the custodian's mere declaration that there were enemy heirs. We cannot believe that Congress ever so intended. We

freely grant that the power exists in the custodian to seize property of living individuals, and corporations in the first instance without proof but there is no case that holds this power extends to seizure of funds of a decedent's estate that have been escheated or are escheatable and actually paid into the treasury of a State.

The right to seize enemy property is nowhere expressly given by the Constitution. It is implied solely from the right of Congress to declare war. But no one provision of the Constitution express or implied is superior to the others. In *Com. v. First Nat. Bk. and Trust Co. of Easton,* 303 Pa. 241, 246, 154 A. 379 (1921), our late Chief Justice (MAXEY) said, " 'In the United States, the powers of sovereignty are divided between the government of the union, and those of the states. They are each sovereign with respect to the objects committed to it, and neither sovereign with respect to the objects committed to the other.'

"Article X of the federal Constitution provides that 'the powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people.' The United States government has no powers except those 'expressly given, or given by necessary implication.' MARSHALL, Chief Justice, in Martin v. Hunter's Lessee, 1 Wheat. 304, 326, 4 L. edition 97, 103. The respective supremacies of the state and national government in their respective spheres of sovereignty have been meticulously observed by the nation and each individual state. Within their individual spheres they are as sovereign as if they were two independent foreign states. There are many governmental activities in respect to which the federal government is not the states' superior or sovereign. McLEAN, J., in License Cases, 5 How. 504, 588, 12 L. edition 256, 293, says: 'The powers

of the general government and of the state, although both exist and are exercised within the same territorial limits, are yet separate and distinct sovereignties, acting separately and independently of each other, within their respective spheres.'"

Among these rights and powers thus reserved to the states perhaps none had earlier recognition nor none so well established as that of the field of inheritance law. The U. S. Supreme Court has consistently recognized the several states' right to determine how property, real or personal within its confines shall be permitted to be transmitted by descent or will. See for example *Mager v. Grima et al.*, 49 U. S. 490 (1850).[3] So supreme are the states in this field that in *U. S. v. Fox*, 94 U. S. 315 (1876), a statute of New York confining devises of lands to natural persons was held to exclude the United States from taking a devise that a testator made to it. And the same was held true as to personal property bequests, *U. S. v. Burnison et al.*, 339 U. S. 87 (1950). Recent adherence to this doctrine may also be found in the escheat cases. See *In re Escheat of Moneys in Custody of U. S. Treasury*, 322 Pa. 481, 186 A. 600 (1936), 326 Pa. 260, 192 A. 256 (1937), aff. 303 U. S. 276 (1937), nom. *U. S. v. Klein; Cunnius v. Reading School District*, 206 Pa. 469, 56 A. 16 (1903), aff. 198 U. S. 458 (1904); *Com. v. Dollar Savings Bank*, 259 Pa. 138, 102 A. 569 (1917). In *Hamilton v. Brown*, 161 U. S. 256, 263 (1895), Mr. Justice GRAY traces the English origin of a state's right to escheat property within its boundaries and then writes significantly, "In this country, when the title to land fails for want of heirs and devisees, *it escheats to the State*

---

[3] See also *U. S. v. Perkins*, 163 U. S. 625, 627, 628 (1895); *Plummer v. Coler*, 178 U. S. 115, 137 (1899); *Maxwell v. Bugbee*, 250 U. S. 525, 536 (1919); *Irving Trust v. Day*, 314 U. S. 556, 562 (1941); *Demorest v. City Bank Co.*, 321 U. S. 36, 48 (1943).

as part of its common ownership, either by mere operation of law, or upon an inquest of office, according to the law of the particular State. 4 Kent Com. 424; 3 Washb. Real Prop. (4th ed.) 47, 48."

These rights of sovereignty being guaranteed to the State by the reservations of the 10th Amendment to the Federal Constitution cannot be set at naught by any Act of Congress which would subtract these attributes. The Federal Government having no power to escheat cannot gain it by indirection through an over-zealous interpretation of the war powers. We do not and should not presume that Congress ever intended its statute to be used in the manner here asserted for as Chief Justice STONE stated in *Parker v. Brown,* 317 U. S. 341, 351 (1943), "In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress."

But entirely aside from the question of power, certainly the custodian cannot seize escheatable property lawfully in the possession of the Commonwealth unless Congress has clearly or expressly authorized such a seizure. The custodian relies chiefly on Sec. 5(b) of the Trading with the Enemy Act of October 6, 1917, as amended by the Act of Dec. 18, 1941, 55 Stat. 839 (50 U. S. C. Appendix Pocket Part of 1950, p. 209), which reads, "(b)(1) During the time of war . . . the President may, through any agency that he may designate . . . (B) investigate, *regulate,* direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, *any property* in which any foreign

country or a national thereof has *any interest, by any person, or* with respect to any property, subject to the jurisdiction of the United States; and *any property or interest* of any foreign country or national thereof *shall vest,* when, as, and upon the terms, directed by the President, in such agency or person as may be designated from time to time by the President, and upon such terms and conditions as the President may prescribe such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States . . ." (emphasis supplied)

It is obvious, as the appellant's learned counsel argues, that the word "person" as used would not include a Sovereign State. Especially is this so where clause 3 of this subdivision defines the term person as therein used to mean "individual, partnership, association or corporation." Apparently realizing this, the learned attorney for the U. S. Government argues that the vesting power is not restricted to property of a *person* but is granted without qualification as to who possesses or holds the property, person or not. This argument is specious for it attempts to split the power of the President into two separate parts, viz. "regulating" and "vesting" notwithstanding they are embraced in a single sentence and hence must be construed together. Vesting does not take place by mere operation of law without action by anyone. It is initiated by an act of the President or the agent designated by him, hence the formal vesting order which it has been the consistent practice of the custodian to serve. That is the initial step in vesting alien property. So we must conclude that the property which "shall vest" is the property as to which there has been an "acquisition, holding, withholding, use, transfer" etc. and the President or custodian has directed such vesting to be made, etc.

That is to say, the property which "shall vest" is the property of some "person."

Moreover, what is here claimed is a sum of money that had been paid into the Commonwealth's Treasury and commingled with other funds. It exists now, as it did when the custodian issued his second or supplemental vesting order, only as a credit item, nothing more. It is therefore not the type of property that could be seized except as a credit due some person or persons.

The learned Deputy Attorney General for the Commonwealth sets forth several other potent reasons which require the reversal of the learned court below, among which are: The summary seizure of property by an executive agent would be in direct contravention of the "due process" clause of the Constitution if it were not for Section 9 of the Trading With the Enemy Act which provides a judicial review of facts on which such seizure was based: *Central Union Trust Co. of New York v. Garvan*, 254 U. S. 554, 556 (1920); *Stoehr v. Wallace*, 255 U. S. 239 (1920). Section 9 (50 U. S. C. A. App. sec. 9) authorizes *"Any person* not an enemy or ally of an enemy claiming any interest, right, or title in any money . . . seized" etc. to institute a suit in equity. It is by no means clear that *person* as used in this section includes a sovereign state. In fact the contrary is indicated by that portion of the section which fixes the venue to be, "in the district court of the U. S. for the District of Columbia or in the district court of the United States for the district in which the *claimant resides,* or if a *corporation,* where it has its *principal place of business."* One cannot escape the implication that Congress never contemplated a Sovereign State's funds being seized on the pretext that it belonged to an enemy else a venue would have been fixed for that eventuality also. Moreover, the word

person is never generally construed to include a sovereign whether the United States (*Savings Bank v. U. S.,* 86 U. S. 227, 239 [1873]) or a State,[4] (*U. S. v. Railroad Co.,* 84 U. S. 322 [1872]). The general rule is a sovereign state is not a person: *Berton v. All Persons,* 176 Calif. 610, 617. Since then no remedy is provided for a state to regain its funds summarily seized by the custodian, such action would offend the due process clause of the Federal Constitution and such intent is not to be attributed to congress in absence of a clear expression.

But assuming a sovereign state is included in Sec. 9, the remedy afforded would be illusory for it shifts the burden of proof from the custodian to the State. If with all the facilities available to the Federal Government through its army of occupation in Germany it could not more than five years after the termination of hostilities discover the names or locate the unknown persons it claims to be heirs and German nationals, how could the Commonwealth of Pennsylvania hope ever to discover them. In *Link's Estate No. 1,* 319 Pa. 513, 516-517, 180 A. 1 (1935), we said, "It is only by the grace of the Commonwealth that heirs or legatees

---

[4] The learned attorney of the U. S. Department of Justice, in a footnote to page 6 of his brief, suggests though he does not assert, that perhaps the word person as used in Section 9, according to Sec. 2 of the Act, includes also a corporation or body politic. But that definition in Sec. 2 of the Act neither controls the definition of person in subdivision b of Sec. 5, nor in Sec. 9. Besides, even the term "body politic" does not always apply to a sovereign: vide Justice STRONG in *Savings Bank v. U. S.,* 86 U. S. 227, 239 (1873), where citing *Magdalen College Case,* 11 Reports 74, he says, "It is a familiar principle that the King is not bound by any act of Parliament unless he be named therein by special or particular words. The most general words that can be devised (for example, any person or persons, *bodies politic* or corporate) affect not him in the least, if they may tend to restrain or diminish any of his rights and interests."

are permitted to receive any benefit from a decedent's toil and energy. But it reserves to itself the right, as it always has, to take the property of a decedent when under its laws there is no one in a position to inherit. The property of an intestate decedent who dies without known heirs is not mere flotsam or jetsam to be taken by anyone claiming it. In such circumstances, the Commonwealth stands in relation to the property of the decedent as one asserting a substantial right thereto. The Commonwealth's claim is not based on charity, gratuity, or unearned benefit; it was by its protection that it was possible for the decedent to acquire such accumulation of property as he possessed." Thus the Commonwealth when in possession of a decedent resident's estate may hold as a party prima facie entitled —as ultimate heir so to speak—and any person claiming to be next of kin superior to the state's right has the burden of proof. To permit the custodian to reverse this burden and cast on the state the onus of proof of non-existent heirs is a virtual confiscation of what must otherwise belong to the state.

Next the learned Deputy Attorney General for the Commonwealth makes the point that the United States may not sue the Commonwealth in the *state courts* without the Commonwealth's consent.[5] This is true and follows from the doctrine of sovereign immunity: see *Monaco v. Mississippi*, 292 U. S. 313 (1933).

A sovereign can be sued only in the way of his own appointment and may prescribe any mode he pleases: *Fitler v. Commonwealth*, 31 Pa. 406, 408, (1850). And only in that way: *Merchants' Warehouse Co. v. Gelder*, 349 Pa. 1, 20, 36 A. 2d 444 (1944); *Kaufman Construction Co. v. Holcomb*, 357 Pa. 514, 55 A. 2d 534

---

[5] Though it is conceded the U. S. may sue a state in the U. S. Supreme Court under Article III, sec. (2) of the federal constitution.

(1947). The right to sue this Commonwealth depends then upon the statute giving consent. Such consent is given by the Commonwealth as to moneys paid into the State Treasury without escheat by either or both provisions in two acts, namely, by Sec. 504 of The Fiscal Code, 72 P.S. 504, or by the Act of June 24, 1939, Sec. 10, 27 P.S. 443.

The right to recover funds from the State Treasury by both acts is expressly conditioned as to the proof required before any money can be paid out. These conditions must be met or the suit cannot be maintained. *Federal Deposit Insurance Corp. v. Board of Finance & Revenue, etc.,* 368 Pa. 463. The United States or the Alien Property Custodian,[6] if they seek to come into the state courts under these acts must meet the same conditions as any private party. The United States, when it comes into the state courts, divests itself of its sovereignty and has no superior right: *U. S. v. Stinson,* 197 U. S. 200 (1905) ; *American Propeller & Mfg. Co., v. United States,* 300 U. S. 475, 478 (1936) ; *Guaranty Trust Co. v. United States,* 304 U. S. 126 (1938).

What then are the conditions the United States or the custodian must meet under the cited acts giving the Commonwealth's consent to be sued for refunds. Under Sec. 504 of The Fiscal Code which we quote, we have italicized the conditions that appear therein. "The *owner of any moneys* which shall have been paid into the State Treasury by order of court, entered upon petition of the Attorney General alleging that such moneys were subject to escheat, or the legal representatives of such owner, may at any time apply to the Board of Finance and Revenue for a refund of the

---

[6] It has been held suit against the Alien Property Custodian is in effect a suit against the U. S.: *Cummings v. Deutsche Bank,* 300 U. S. 115 (1937) ; *Becker Co. v. Cummings,* 296 U. S. 74, 78 (1935) so the converse must be equally true.

same, and, *upon his making proof of his ownership or
right of possession to the satisfaction of the board,* such
moneys shall be paid him, on the requisition of the
board, and the warrant of the Auditor General drawn
on the State Treasurer in conformity therewith, out
of any moneys in the State Treasury appropriated for
the purpose, with interest thereon at the rate of two
per centum per annum from the date when said moneys
were paid into the State Treasury to the date of the re-
fund thereof, and any moneys escheatable under the
provisions of any act of Assembly, which have been
heretofore voluntarily paid into the State Treasury,
or which may be hereafter so paid, shall be likewise re-
funded in the same manner in which moneys so paid
pursuant to an order of court are refunded under the
provisions of this act. . . ."

Sec. 10 of the Act of June 24, 1939, P. L. 660, 27
P.S. 443, which we now quote, also imposes the condi-
tions which we italicize: "Section 10. Refunds.—(a)
Any *person* legally entitled to any moneys which shall
have been paid into the State Treasury under the pro-
visions of an order of court entered upon petition of
the Attorney General asking for the payment of such
moneys into the State Treasury without escheat (or
the legal representatives thereof), may, at any time,
apply to the Board of Finance and Revenue for a re-
fund of the same, and, upon his making *proof of his
ownership or right of possession to the satisfaction of
the board,* such moneys shall be paid to such person,
on the requisition of the board and the warrant of the
Auditor General drawn on the State Treasurer in con-
formity therewith, out of any moneys in the State
Treasury appropriated for the purpose, with interest
thereon at the rate of two per centum per annum from
the date when said moneys were paid into the State
Treasury to the date of the refund thereof. Any moneys

which shall have been voluntarily paid into the State Treasury, or which shall have been paid in under the provisions of an order of court entered upon the petition of the Attorney General asking for the payment of such moneys into the State Treasury without escheat, shall be refunded in the same manner and under the conditions hereinabove prescribed."

Under either statute there must be proof of ownership or right to possession, to the satisfaction of the Board.[7]

The Custodian does not pretend to do either. He merely asserts a right to possession by the mere statement that the sum claimed is the property of German next of kin, unnamed, unidentified and possibly nonexistent. This certainly is not meeting the condition imposed in the act by which the Commonwealth gives its consent. Not meeting the condition, he cannot maintain his suit, for he stands in no superior position to any other claimant.

The practical result of a decision in favor of the Attorney General or Alien Property Custodian is that he could come into any State where funds of a decedent with no known heirs were in the possession of the Sovereign State, and seize such funds on the mere ipse dixit or pretext of the existence of unidentified, unnamed enemy alien heirs and because of the inability of the State to prove that the decedent died without known heirs, deprive the State of moneys or property to which, from time immemorial, it has always been entitled. Such a deprivation of the State's property and of the State's sovereignty is unauthorized by the Con-

---

[7] The Board of Finance and Revenue to which an appeal lies from the Board of Claims is undoubtedly like the latter board, a judicial body: see *Merchants' Warehouse Co. v. Gelder*, 349 Pa. 1, 36 A. 2d 444 (1944) ; *Lowry v. Commonwealth*, 365 Pa. 474, 477, 76 A. 2d 363 (1950).

stitution of the United States, or by the Trading With The Enemy Act, or by any prior decision of the Supreme Court of the United States, or of this court.

There remains only to be said that all the cases cited in the minority opinion or relied on by the learned court below and by the learned counsel for the Custodian are clearly distinguishable. In *Commonwealth v. Von Zedtwitz,* 215 Ky. 413, 285 S. W. 224, cert. den. 273 U. S. 735, it was *admitted* that defendant was an alien enemy. The same was true in *Miller's Estates,* 183 Ore. 452, 193 P. 2d 539, where it was established that the legatees were sisters of the decedent and nationals of Germany. In *Application of Alien Property Custodian of U. S.,* 270 N. Y. App. Div. 732, 60 N. Y. S. 2d 897, 901 (1946), the court upheld the vesting order "provided Viscomi was a national of Italy." *In re Yokahama Specie Bank,* 188 N. Y. Misc. 137, 66 N. Y. S. 2d 289 (1946), it was not disputed that the bank as its title indicated was an enemy national. In *Gregg's Est.,* 266 Pa. 189, 109 A. 777 (1920), this court merely affirmed the decree of the Orphans' Court awarding the share of an enemy alien legatee to the Alien Property Custodian.

Since the case was argued our attention has been called by the learned counsel for the Custodian to the case of *Estate of Domenico Stagnaro (McGrath v. Cox),* Civil No. 14737, decided October 15, 1951. This is a decision by the District Court of Appeals of California. That court is one of twelve such district appeal courts in California. The decision is by three judges of one district and while entitled to respect, it does not have the weight of a decision of a state-wide appellate court or court of last resort. However, we have examined it and conclude it does not help the Custodian's case. All that it really decides is that the custodian may file a vesting order before the probate court

determines the fractional share of the heir or heirs whose interest is vested. This may be conceded. In fact, we have already said that the original vesting order here filed was in proper form, properly accepted by the Orphans' Court and serves to protect the custodian's rights even though no heirs are named therein. But the custodian's claim now being reviewed goes far beyond the scope of his original vesting order.

. The learned Deputy Attorney General for the Commonwealth also calls our attention to the following appellate court decisions which we find confirm our views: *Rade's Estate,* 259 Wisc. 169, 47 N. W. 2d 891 (May 8, 1951); *Blau's Estate,* 4 N. J. Super. 343, 67 A. 2d 316 (1949); *Sutherland v. Wickey,* 133 Oregon 266, 289 Pac. 375 (1930). All of these cases hold that the Trading with the Enemy Act cannot be reasonably interpreted as taking away from the State Courts their peculiar jurisdiction to determine the heirs of a resident decedent and adjudicate their status as such.

The Oregon case cites *Miller v. Clausen,* 299 Fed. 723 (1924) (C. C. A. 8th Circuit) (appealed to the U. S. Supreme Court but dismissed on appellant's mo tion) which rules that the Nebraska County Court had jurisdiction to determine who were the heirs to certain land within the state, although the Alien Property Custodian had vested the land because some heirs were alien enemies. The court there said: "The contention that the county court of Morrill county had no jurisdiction because of the provisions of the Trading with the Enemy Act is not sound."

It is asserted by the Custodian's counsel that to uphold the Commonwealth's position in this case would mean that the former enemy owner could at some future date reclaim it from the custody of the State. This is not true, for we all agree that the Trading with the Enemy Act divests the property right of an enemy own-

er and operates to assign to the Custodian whatever interest he may have. This the Commonwealth admits: *Commercial Trust Co. v. Miller,* 262 U. S. 51 (1923); *Woodson v. Deutche etc. Vormals,* 292 U. S. 449 (1934); *Zittman v. McGrath,* 341 U. S. 471 (1951). Thus, if or when a claimant appears the Custodian or his successors being of record by the award, will undoubtedly receive notice of any such claim which if established on behalf of any alien enemy next of kin will be paid only to the Custodian whose first vesting order operates as an assignment by operation of law and as such must be honored.[8] We therefore repeat with emphasis what we have hereinbefore stated, that the Custodian and the Government's interest are fully protected by the first and original vesting order filed subject to which the Orphans' Court made its award.

The decree of the court below sustaining the appeal from the Board of Finance and Revenue is reversed at the costs of the appellee.

DISSENTING OPINION BY MR. JUSTICE JONES:

The majority's extended discussion of our dual form of government and the constitutional separation of powers between the Federal Government on the one hand and the several States on the other is presently academic. It is advanced to support the mistaken thesis that the validation of the Alien Property Custodian's claim to the fund in controversy would violate the

[8] Cf. *Estate of Henrietta E. Garrett,* No. 2552 (1932) Orphans' Court of Philadelphia County, where Judge KLEIN made a recent award of over $6,000,000 to "J. Howard McGrath, Attorney General of the United States, Successor to the Alien Property Custodian, pursuant to Vesting Order No. 358, dated November 13, 1948, vesting the share of Johann Peter Christian Schafer, I, now deceased" who was found to be next of kin of the original decedent, and an enemy national.

Commonwealth's right to determine and control the devolution of property within its borders. No such question is here involved. The fact of the matter is that ownership of the fund is not in issue. Indeed, the majority opinion at one point concedes (see footnote 2) that the only right of the Commonwealth to the fund (which the Orphans' Court awarded it *without escheat*) is to "custody and possession subject to reclamation by one presenting proofs of better title." Elsewhere the majority opinion proceeds on the assumption that the fund belongs to the Commonwealth. Yet, the sole question is which party presents a better right to custody of the fund, and the matter of fundamental importance is the paramountcy of a Federal statute enacted pursuant to an express power conferred upon Congress by the Constitution of the United States,—in this instance, the power to declare war.

The assumption is unwarranted that the Trading With the Enemy Act (40 Stat. 411), amended by the First War Powers Act of 1941 (55 Stat. 839, 50 U. S. C. A. App. §§1-40, 616-620), as applied by the learned court below to the facts of this case, constitutes an interference with State activities. In no true sense can such application of the Act be thought of as an invasion of a State's power over the devolution of property within its borders: see *Miller v. Clausen*, 299 F. 723 (C. C. A. 8), where a Nebraska county court's decree of heirship, handed down three years after the Alien Property Custodian vested the land, was recognized by the Federal court in proceedings against the Custodian under Section 9 of the Trading With the Enemy Act. At p. 727 the court said, "The contention that the county court of Morrill county had no jurisdiction because of the provisions of the Trading with the Enemy Act is not sound. That act did not take away from the county court its peculiar jurisdiction

to determine who were the heirs . . . and to adjudicate their status as such." Nor does the Act deprive the Commonwealth of its right to escheat if the necessary conditions are met: see *Commonwealth v. Von Zedtwitz*, 215 Ky. 413, 285 S. W. 224, 228, where certiorari by the United States Supreme Court was denied, 273 U. S. 735. In that case the Supreme Court of Kentucky, rejecting the argument of the Commonwealth that the Trading With the Enemy Act interfered with the powers reserved to it by the Constitution, declared, "The act took away from the commonwealth of Kentucky no right it had of escheating the lands in question, but only required it to institute and prosecute any such action in the federal district courts . . . ." In last analysis, the Act constitutes nothing more than an appropriate exercise of the war-making power which the Constitution of the United States reposes in the Congress (Article I, Section 8) and, being such, it binds the judges in every State "anything in the Constitution or laws of any State to the contrary notwithstanding" (Article VI).

The vesting authority conferred upon the Alien Property Custodian by Section 5 (b) of the Trading With the Enemy Act as amended (50 U. S. C. A. App. §616) is not limited to the vesting of property in the hands of a "person" but is applicable to "any property . . . of any . . . foreign . . . national . . ." and is therefore broad enough to include property in the custody of a State: *In re Yokohama Specie Bank, Limited*, 188 N. Y. Misc. 137, 66 N. Y. S. 2d 289. The distinction between the regulating powers and the vesting powers conferred by Section 5 (b) of the Act is by no means specious as the majority opinion states. That Section provides that ". . . the President may, through any agency that he may designate, . . . regulate, . . . nullify, . . . or prohibit, any . . . transactions involving, any

property in which any foreign country or a national thereof has any interest, by any person, or with respect to any property, subject to the jurisdiction of the United States; and any property . . . of any foreign . . . national . . . shall vest, when, as, and upon the terms, directed by the President . . . ." This provision plainly authorizes regulation, such as licensing of transactions and blockage of assets, independent of vesting and has been recognized so to do by the Supreme Court of the United States. In *Propper v. Clark*, 337 U. S. 472, 483, it was said that "The plan for prohibition of unlicensed transactions by foreign nationals comprehends blocking of transfers of credits *and* vesting of local assets . . . . If transactions are blocked, *vesting may or may not follow*" (Emphasis supplied). Moreover, Section 7 (c) of the Act (50 U. S. C. A. App. §7 (c)) provides that ". . . any . . . property . . . belonging to . . . an enemy . . ., which the President after investigation shall determine . . . so belongs . . ., shall be . . . transferred . . . to the Alien Property Custodian, or the same may be seized by the Alien Property Custodian . . . ." The majority opinion ignores this Section entirely.

Once property becomes vested in the Custodian pursuant to a vesting order based on the stated belief that it is the property of an alien enemy, the only recourse available to one seeking to contest the vesting is the remedy provided by Sections 7 (c) and 9 of the Trading With the Enemy Act: see *Propper v. Clark*, supra, at pp. 483-484; *Josephberg v. Markham*, 152 F. 2d 644 (C. C. A. 2) ; *Commonwealth v. Von Zedtwitz*, supra. And where, as here, the Alien Property Custodian vests in himself title to the fund and not merely the interest therein of the alien enemy, he has a right to possess it even though there has been no prior judicial determination of the fact of the enemy interest

or the extent or nature thereof: see *Stoehr v. Wallace,* 255 U. S. 239, 245; *Central Union Trust Company of New York v. Garvan,* 254 U. S. 554, 566; *Commercial Trust Company of New Jersey v. Miller,* 262 U. S. 51, 53.

There remains to be considered only the Pennsylvania legislation applicable to a suit by the Custodian against the Commonwealth in its own courts for the fund in question. The Attorney General of the United States, as successor to the Alien Property Custodian, is a natural person (see Sections 5 (b) and 7 (c) of the Trading With the Enemy Act, supra). He consequently qualifies as the "person legally entitled" under Section 10 of the Pennsylvania Act of June 25, 1937, as amended, 27 PS §443 (a), which provides that "Any person legally entitled to any moneys which shall have been paid into the State Treasury . . . *without escheat* . . . may . . . apply to the Board of Finance and Revenue for a refund of the same, and, upon his making proof of his ownership or right of possession to the satisfaction of the board, such moneys shall be paid him . . ." (Emphasis supplied).

The Custodian's right of possession was ordained by Congress in an exercise of its constitutionally exclusive power to make war. It is obviously a part of the supreme law of the land. Accordingly, the Board of Finance and Revenue abused its discretion in failing to recognize and sustain the sufficiency of the Custodian's "proof of right of possession". The learned court below was correct in holding that the supplemental vesting orders were proof of "better title."

I would, therefore, affirm.

Mr. Justice ALLEN M. STEARNE joins in this dissent.