### SIMON v. MILLER, Alien Property Custodian.

(District Court, S. D. New York. November 19, 1923.)

1. War ⬅️12—Deposit made by alien enemy's debtor under agreement with Department of Justice held not subject to capture.

Where alien enemy's debtor deposited certain amount in bank under an agreement with the Department of Justice not to withdraw such amount until the end of the war, and not to pay any part of it to the alien enemy, the United States had no right to secure possession of the deposit by capture, even if deposit created a security for Alien Property Custodian to be later appointed; such fund not having been created for alien's benefit.

2. War ⬅️12—Deposit in bank by alien enemy's debtor under agreement with Department of Justice held not "for the benefit of" an alien enemy.

Deposit made in bank by alien enemy's debtor under agreement with Department of Justice for appointment of Alien Property Custodian and enactment of Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½a–3115½j) was not held "for the benefit of" an alien enemy, within the Trading with the Enemy Act, so as to entitle Custodian thereto.

3. War ⬅️12—Alien Property Custodian could not make ex parte statement of account between citizen and alien and seize deposit.

Alien Property Custodian had no right to make ex parte statement between citizen and alien enemy, and to seize deposit made by citizen under agreement with Department of Justice, before enactment of Trading with the Enemy Act, under sections 7 (c), 9 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½d, 3115½e).

4. War ⬅️12—Alien Property Custodian held not entitled to counterclaim on alien enemy's captured right to extent of set-off.

In action by alien enemy's debtor, under Trading with the Enemy Act, § 9 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½e), against Alien Property Custodian, for amount deposited by debtor in bank before passage of such act, under agreement with Department of Justice not to

---

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

withdraw amount or pay any part thereof to alien enemy, the Custodian could not counterclaim on alien enemy's captured right to the extent of a set-off under equity rule No. 30, in the absence of a showing that the account between the debtor and the alien enemy was the proper subject of an independent suit in equity, and as to whether debtor had received moneys of alien enemy as his fiduciary, or in other capacity entitling him to an accounting.

5. War ⬩12—Rule as to Alien Property Custodian's right to seize property which may not prove to be of enemy character.

The Alien Property Custodian's right to seize property which may not in the end prove to be of enemy character depends solely on the right of the United States to attach and impound what might otherwise be removed or dissipated, under Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½a–3115½j), and the fund may not be retained by virtue of other claims, if the capture was unlawful.

At Law. Action by John Simon against Thomas W. Miller, as Alien Property Custodian. Decree for plaintiff.

Trial upon a petition under section 9 of the Trading with the Enemy Act (Comp. St. Ann. Supp. 1923, § 3115½e). The plaintiff lived in New York and had had financial dealings with a German subject, one Albert, which had not then, and never have, been stated between them. He denies now, though originally he conceded, that a statement would result in a balance of account against him. On June 14, 1917, after various transactions with officers of the Department of Justice, he made a deposit of $350,000, the amount of the sum due, as he then supposed, in the American Exchange Bank, which he agreed not to withdraw until the end of the war, except upon the signature of himself and his counsel, a person trusted by the department, and not to pay any part of it to Albert. Thereafter on December 13, 1918, the Alien Property Custodian served upon the bank a demand under section 7 (c), being Comp. St. Ann. Supp. 1923, § 3115½d, for the amount of the deposit as property held for Albert. On January 6. 1919, this was followed by a second demand upon the bank in somewhat amplified language, but not substantially different in effect. On April 3, 1919, a third demand was served, this time upon the plaintiff, affecting to seize the debt from the bank to the plaintiff by reason of the deposit, again asserting that it was held for Albert's benefit.

So far there was no attempt to seize the account between the plaintiff and Albert, but on June 1, 1920, such a demand was made on the plaintiff. This determined that Albert was an enemy and that the plaintiff owed Albert, on a statement of the account, the sum of $635,640.96. This sum the demand attempted to seize, and the plaintiff was forthwith required to pay it to the Custodian. After a litigation not necessary to set forth, the Custodian got possession of the deposit in the American Exchange Bank, which this petition was filed to recover.

The defendant asserts title to the deposit on the ground that it was in any aspect property held in trust for Albert, since he had at least an eventual interest in it. Next that, quite independently of this, the Custodian had the right to state the account between Albert and the plaintiff ex parte, and to require the plaintiff to pay the balance found; and, if so, that, having got possession of the fund, the plaintiff might not recover it, though the capture was invalid as enemy property, until the accounts were stated in this court, and until it appear how much is due between the parties.

The plaintiff asserts that the deposit was not made for Albert's benefit, but always remained the plaintiff's property. Hence the three captures of it were invalid. As to the defendant's capture and statement of the account, that, although by the capture the defendant was substituted for whatever rights Albert had in the account, any ex parte statement was not valid against him, that he was not bound to pay anything till some court had stated the account, and that the defendant had no right to retain the deposit as his asset. Hence that his title to the deposit was clear, and a decree should pass without more, leaving the defendant to sue him upon the captured account.

Henry A. Wise, of New York City, for petitioner.
Dean Stanley, of Washington, D. C., for defendant.
Arthur Garfield Hays, of New York City, for intervener.

LEARNED HAND, District Judge (after stating the facts as above). [1] The first three captures were invalid, and cannot serve the defendant. They must stand upon the theory that the fund was created for Albert's benefit, which is not true. The deposit arose because the officials of the Department of Justice wished to impound the plaintiff's assets up to the supposed balance due on the account, and to prevent its payment to Albert. Even if it be true that the deposit in fact created a security for some such official as the Custodian, to be later appointed, still it was consensual in its origin, and the United States had no right to secure its possession by capture. To acquire such property it must resort to the ordinary processes of law, exactly as in the case of any other civil rights with which it might be vested. The seizure, being unauthorized, was wrongful, and the defendant cannot assert it to maintain custody of the fund.

[2] However, it is argued that, although the supposed security was not created for Albert, still after the passage of the Trading with the Enemy Act it became property held for his benefit. The theory is this: That as it was created to secure any claim which the Custodian might assert upon the account, it became a security for that account. That after seizure of the account Congress might determine to direct the Custodian to repay all sums collected to Albert. Hence, if the Custodian realized upon the security and Albert might get the proceeds, the security was already held for Albert.

Clearly this is not what was meant by the words "for the benefit of" an alien enemy. The enemy must have some present interest in the property to subject it to capture. Here there was no more than a mere possibility that Congress might recognize such an interest, which it has not even yet done, except to a limited extent. The argument is especially fanciful, in view of the fact that the deposit was made especially to prevent payment to Albert, and was to terminate with the war, when for the first time Albert could regain any capacity to sue in an American court. Thus at no time before April 3, 1919, the date of the last seizure, had Albert any existing interest in the deposit to be captured. The defendant cannot prevail on this theory.

[3] Hence the defendant must rely on the seizure and statement of the account on June 1, 1920, and the question is whether the Custodian's power extended beyond the right to garnish or attach Albert's claim, and included the right to state the account ex parte and to compel the payment of the balance found. Taken literally, the words of section 7 (c) seem to go so far:

"Any money * * * owing * * * to * * * an enemy * * * which the President after investigation shall determine is so owing * * * shall be * * * paid over to the Alien Property Custodian or * * * may be seized by the Alien Property Custodian."

It is argued, further, that if the Custodian might, as in fact he might, demand the delivery of chattels without regard to whether they were

enemy owned, it is not severer to compel the payment of the balance at which he states an account between the parties. A chattel on bailment was once only a chose in action. To the objection that in the case of a chattel the thing itself is the res, while in the case of a chose in action the existence of any res depends upon its liquidation, the defendant answers that the only capturable res in the case of a chattel is the enemy's jus in re, and that the Custodian's power therefore concededly extends beyond what may turn out to be his eventual rights.

The consequences of such a power are excessively drastic, and would indeed be extravagant in operation. The Custodian might, in the case of the breach of a contract for the sale of goods or for their manufacture, undertake a liquidation of damages which, however honest, would have no relation to what should eventually be recovered. How could such a finding be enforced? The debtor must collect money to pay it, and, if he had none, must sell his goods till he got in hand the necessary cash. That is in fact execution in limine, a loss scarcely remediable by suit under section 9. It contradicts all our notions of the rights of putative debtors who dispute the debt; it has no analogy in those possessory suits on which reliance was put, in part anyway, in Central Union Trust Co. v. Garvan, 254 U. S. 554, 41 Sup. Ct. 214, 65 L. Ed. 403. Rather one would look to the common procedure in garnishment, by which a discharge of the debt is paralyzed, and the asset effectively sequestered, until any controversy as to its existence or amount can be determined.

Nor does it seem to me that any such interpretation is called for by the general purposes of the legislation in question. Captures had a double purpose. They changed the title in any actual rights which the enemy might have in the captured property, and they sequestered the property itself in which those rights might inhere. The plaintiff concedes that the demand of June 1, 1920, gave title to the Custodian to all Albert's rights to the account; he disputes, however, that after the Custodian's statement of the account his individual assets might be sequestered to pay the balance found.

The summary power to sequester property depends upon the protection necessary to secure the United States in the assertion of its eventual right by capture; the property must be held in custody until any disputes shall be determined, just as is done in replevin or attachment. In the case of chattels or tenements this involves possession ad interim of the property itself, since otherwise the chattel might be delivered or the profits collected and disbursed. That would make ineffectual any final decree of title.

But these considerations cannot apply to the capture of a debt. A creditor has no rights in his debtor's assets and is not concerned with their fate. The debt remains a general obligation, regardless of their disposition. Whatever makes invalid any payment by the debtor protects the captor of the debt. No possession is necessary, because none is possible; the captor is secure so long as the debtor cannot discharge the debt. How, then, can it be argued that the scheme of the act involved a payment of the debt in præsenti? The captor being protected, why must the debtor be exposed to execution in limine?

It is quite true that in this very litigation it has been decided (American Exchange Nat. Bank v. Garvan, 273 Fed. 43 [C. C. A. 2]; Simon v. American Exchange Nat. Bank, 260 U. S. 706, 43 Sup. Ct. 165, 67 L. Ed. 474) that a debtor must pay an acknowledged debt to the Custodian, regardless of any controversy as to who is the creditor. But such a rule imposes no hardship upon the debtor, who is protected under section 7 (e) from any pursuit by any other person. It changed no element of the contract, except the promisee, and all the promisor is in any case entitled to is a valid discharge. It is true that such summary remedy was as little necessary to protect the captor as in the case at bar, but, the rights of the debtor being preserved, he has no right to complain. The rule in that case does not affect this, where sequestration presupposes a change in the substance of the debtor's obligation as he asserts it. The plaintiff has indeed changed his position upon the balance due; that is no doubt a suspicious circumstance, but alone it cannot subject him to summary execution upon his obligation.

When the language of a statute admits an interpretation which avoids any constitutional question, it should be adopted. Perhaps under the war power Congress might have gone so far, but surely there must be clear expression of such a purpose to overset the traditional methods in analogous cases. I ought not lightly to impute to such general words so oppressive a purpose; the language must be confined to debts whose validity and extent the debtor acknowledges.

[4] The last objection is that, regardless of whether the Custodian had any right to seize the fund, the defendant, now having it, may counterclaim on Albert's captured right to the extent of a set-off. This may be put most persuasively as resulting from equity rule 30. The accounting, being "the subject of an independent suit in equity," may be set off against the plaintiff's right to the fund seized. But a suit under section 9 is not necessarily subject to the general rules in equity; perhaps it is, but the question is not wholly clear. Again, it does not appear that the account between the plaintiff and Albert was the proper "subject of an independent suit in equity." That point was not developed at the hearing, and I cannot say whether it be so or not. So far as appears, it may depend merely upon cross items of indebtedness. I do not know whether the plaintiff had received moneys of Albert as his fiduciary, or in such other capacity as entitled him to an accounting. The answer says nothing of the character of the account.

[5] However, I need not rely upon either of these points. As I have already said, the Custodian's power to seize property, which may not in the end prove to be of enemy character, depends solely upon the right of the United States to attach and impound what might otherwise be removed or dissipated. It is an interlocutory remedy, designed to make effectual the capture of true enemy property. Central Union Trust Co. v. Garvan, supra. When the seizure is unlawful, the petition under section 9 does no more than establish the plaintiff's right and the consequent illegality of the capture. It is analogous to the vacation of an attachment levied upon the goods of a third person. If the suit may be answered by an independent claim against the plaintiff,

the seizure itself is legalized; the defendant is put in exactly the same position as though the seizure had been valid. To pursue the analogy of attachment, it would be as if the creditor might support an attachment of A.'s property for the debt of B. by an independent claim against A. The petition, while indeed not possessory, is similar to a possessory suit in this: That until the original wrong has been righted the defendant may not undertake to pursue other claims against his victim. Anything else would be a premium upon lawless seizures by the sovereign, the fountain of justice. The defendant must therefore work out his rights as captor of Albert's property after he has restored the plaintiff to the position he would have occupied but for the wrongful seizure.

Decree for the plaintiff.