**LADUE & CO., Plaintiff-Appellant,**

v.

**Herbert BROWNELL, Jr., Attorney General of the United States, Etc., Defendant-Appellee.**

**No. 11305.**

United States Court of Appeals, Seventh Circuit.

March 18, 1955.

Samuel E. Johnson, Nathan Shefner, Chicago, Ill., for plaintiff-appellant.

Robert Tieken, U. S. Atty., Chicago, Ill., Rollins M. Koppel, Dept. of Justice, Washington, D. C., Dallas S. Townsend, Asst. Atty. Gen., James D. Hill, George B. Searls, Attys., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before DUFFY, Chief Judge, and FINNEGAN and SWAIM, Circuit Judges.

SWAIM, Circuit Judge.

This appeal is from an order of the United States District Court for the Northern District of Illinois, Eastern Division, dismissing the plaintiff's complaint.

The plaintiff, Ladue & Co., an Illinois corporation, a dealer in securities since 1948, brought this action against the defendant, Herbert Brownell, Jr., Attorney General of the United States, as Successor Alien Property Custodian, to recover property seized, as the property of enemy aliens, by the defendant under the alleged authority of the Trading with the Enemy Act, as amended, 50 U.S.C.A. Appendix, § 1 et seq. The complaint alleged that since its incorporation plaintiff had been a citizen of the United States and that since that date it was neither an enemy, the ally of an enemy nor a national of any foreign enemy country within the meaning of the Trading with the Enemy Act, or any regulation, proclamation or order issued in connection with that Act.

The complaint further alleged that the plaintiff was the sole owner of certain stocks, securities and the accruals thereon, issued by the St. Louis Southwestern Railway Company and the City of New York; that at no time on or since April 13, 1953, had said property been owned, controlled or held for the benefit of any enemy aliens; that the defendant, on April 13, 1953, purporting to act under the authority of the Trading with the Enemy Act and certain executive orders relating thereto, issued his Vesting Order 19266, vesting in defendant said securities and the accruals thereon, the order alleging that the securities were owned by unknown German nationals; that on April 16, 1953, the defendant acting under said vesting order instructed the Manufacturers Trust Company of New York City to pay to defendant the $3,187.50 interest which had accrued on said securities during the period from October 1, 1945 to October 1, 1952, inclusive. The complaint further alleged that the said vesting order was void and of no force or effect, and that the action of the defendant in appropriating the securities described therein and the accruals therefrom was a confiscation and taking of plaintiff's property without due process of law.

The complaint therefore prayed that the defendant be ordered to revest in plaintiff the title to the securities, and that the defendant account for and pay to the plaintiff all moneys received by the defendant as income from said securities.

The Government moved to dismiss the complaint on the ground that plaintiff had not filed the notice of claim required by Section 9(a) of the Trading with the Enemy Act. The plaintiff in its brief in this court makes no mention of its failure to file the required notice of claim, apparently relying on its contention that the seizure, having been made after the official termination of war, was unconstitutional and that a notice of claim was, therefore, unnecessary. We shall first consider the constitutionality of the seizure.

The plaintiff cites as supporting this contention several decisions in which there are various statements which plain-

tiff contends support its position. In Brownell v. Edmunds, D.C., 110 F.Supp. 828, the interest of the German nationals under a last will and testament did not vest until after the termination of the war. The Alien Property Custodian issued a vesting order in 1946 attempting to seize the interest of the German nationals before the interest was vested. The court there properly held that such a vesting order was invalid because at the time it was issued there was no interest in German nationals subject to seizure. The Joint Resolution by its terms only reserved the right to seize property which was "prior to January 1, 1947, * * * subject to vesting or seizure under the provisions of the Trading With the Enemy Act * * *." 65 Stat. 451.

Stoehr v. Wallace, 255 U.S. 239, 41 S.Ct. 293, 65 L.Ed. 604, concerned a seizure during war. In the opinion, 255 U.S. at page 245, 41 S.Ct. at page 296, the Supreme Court said: "That Congress in time of war may authorize and provide for the seizure and sequestration through executive channels of property believed to be enemy-owned, if adequate provision be made for a return in case of mistake, is not debatable." That opinion was not concerned with whether such seizures might be made after the formal termination of the war. Orme v. Northern Trust Co., 410 Ill. 354, 102 N.E.2d 335, certiorari denied Von Hardenberg v. McGrath, 343 U.S. 921, 72 S.Ct. 677, 96 L.Ed. 1334, also involved property seized prior to the formal termination of the war.

In Miller v. Rouse, D.C., 276 F. 715, a demand, signed before the date of the proclamation of peace in World War I, was served three days after the proclamation. The court there held, contrary to the contention of the Custodian, that the mere signing of the demand was not sufficient; that the property did not become the "subject" of a demand until all steps were taken which would vest the property in the United States; that such vesting did not occur until the demand was served, which demand, coming after the declaration, was too late.

In Matheson v. Hicks, D.C., 10 F.2d 872, 873, it was also held that a demand served after the termination of World War I was too late to transfer the property to the Custodian.

In Application of Miller, 2 Cir., 288 F. 760, 767, it was held that the Custodian, having properly made demands for property of an enemy alien could maintain action after termination of war to enforce a seizure which had already been effected by a proper demand. There the question was only as to the effect, if any, of the peace declaration on the claim of the United States to enemy property which had been seized prior to the termination of the war. The court there pointed out that the Joint Resolution of July 2, 1921, terminating World War I, United States Statutes at Large, Vol. 42, Part 1, pages 105, 106, expressly provided that: "All property * * * of all German nationals which was, on April 6, 1917, in or has since that date come into the possession or under control of, or has been the subject of a demand by the United States of America or of any of its officers, agents, or employees, from any source or by any agency whatsoever, * * * shall be retained by the United States of America and no disposition thereof made, except as shall have been heretofore or specifically hereafter shall be provided by law * * *." This resolution did not purport to deal with any property except that seized during the war.

None of these cases cited by the plaintiff decided that the Congress could not, by proper language in the Joint Resolution terminating World War II, have reserved the power to continue to seize enemy property.

The appellant concedes, as it must, that the courts of this country have uniformly upheld the right of the Government to seize enemy property during time of war on the theory that the right is a necessary adjunct to the ability to wage war successfully. Silesian-American Corp. v. Clark, 332 U.S. 469, 475, 68 S.Ct. 179, 92 L.Ed. 81; Stoehr v. Wallace, 255 U.S. 239, 245, 41 S.Ct. 293, 65

L.Ed. 604; Orme v. Northern Trust Co., 410 Ill. 354, 102 N.E.2d 335.

But the appellant insists that where, as here, the Government seeks to use its war powers to seize property of enemy aliens after the state of war has been officially terminated, such a seizure of property may not be justified on the theory that it is a proper exercise of the war powers granted by Article I, Section 8, Clause 11, of the Constitution of the United States.

In the instant case the Joint Resolution which officially terminated the war with Germany expressly reserved and extended the power of the United States to seize for its own use all property located in the United States which prior to January 1, 1947, was subject to vesting or seizure under the Trading with the Enemy Act, and which was owned by nationals of Germany. The reservation of this power was an integral part of formally bringing the war to a close. Cessation of hostilities between the United States and Germany had occurred with the unconditional surrender of Germany on May 8, 1945. From that date to October 19, 1951, when the Joint Resolution was approved, only a technical state of war had existed between the United States and Germany. During that period of more than six years the Government had continued to seize property in this country belonging to German nationals.

In recommending to the Congress the adoption of the Joint Resolution declaring the end of the war the President explained (see Legislative History, U. S. Code Congressional and Administrative Service, 1951, pages 2354 to 2359) that the resolution reserving the seizure power was for the purpose of applying the proceeds of the property seized to pay just and legitimate claims against the United States arising from the war in accordance with the War Claims Act of 1948, 50 U.S.C.A.Appendix, § 2001 et seq., and that if the seizure power were permitted to lapse immediately the Government would find it difficult to wind up the program in an orderly way or to carry out its commitments for the equitable settlement of intergovernmental differences relating to enemy property. The President stated that there was nothing unusual about continuing, even after the conclusion of peace, the power to seize wartime enemy property as part of the peace settlement, citing as examples the treaties the United States had made at the conclusion of World War II with Bulgaria, Romania, Hungary and Italy, all of which treaties had authorized the continued seizure by the United States of property belonging to the nationals of each of those countries. In each of those cases the continuation of the seizure power was provided for in the bilateral peace agreements between this nation and each of the enemy nations involved. We can perceive no real difference between the power of the Government to retain such seizure power, as against individuals, in a treaty and in the unilateral declaration by this nation of the termination of the state of war. In each case the retention of the seizure power beyond the date of the termination of the war was a proper exercise of the war power. As said in Stewart v. Kahn, 11 Wall. 493, 507, 78 U.S. 493, 507, 20 L.Ed. 176, the exercise of the war power is not limited to actual combat. "It carries with it inherently the power to guard against the immediate renewal of the conflict, and to remedy the evils which have arisen from its rise and progress."

In the reservation of the power to seize the property of German nationals Congress may have had in mind that such seizures would tend to serve as a deterrent to a third war with Germany, but it is certain from the Legislative History of the Joint Resolution, as stated above, that the proceeds of the property seized were to be used to remedy the evils which had arisen from the war; that the proceeds of the seized property were to be used to pay the just and legitimate claims against the United States arising from the war in accordance with the War Claims Act of 1948. Seizure of the property of enemy aliens for this purpose was clearly a proper exercise

of the war powers. Under the facts of this case it was not necessary that the actual seizure occur before the approval of the Joint Resolution formally terminating the state of war. Here the Congress considered it necessary to complete the work of cleaning up the aftermath of the war after the effective date of the formal declaration of peace. This was therefore incidental to the war and within the war powers. The Congress and the President may well have considered this work essential to a just and lasting peace, just as essential as the preparation for possible war by the training of armies when the United States was engaged in no war. In United States v. Henderson, 7 Cir., 180 F.2d 711, 713, this court held that the Congress under its power to raise and support armies could conscript and train men in peace time; that it was not necessary to wait for actual war before starting such training.

Since the seizure here was within the war powers it was not a denial of due process, and the plaintiff before filing its complaint to recover was required, under Section 9(a) of the Trading with the Enemy Act, to file its notice of claim. The language of that Section clearly indicates that filing notice of such a claim is a condition precedent to plaintiff's right to file an action in court to recover such seized property or its proceeds. The plaintiff filed this action in the United States District Court on July 27, 1954. No claim for the return of the property had been filed with the defendant, and no application for its return had been filed with the President. Section 9 (a) of the Act provides that any person who is not an enemy alien or an ally of an enemy and who claims any interest or title in seized property may file with the Alien Property Custodian a verified notice of claim containing such particulars as the Custodian may require and that " * * * if the claimant shall have filed the notice as above required and shall have made no application to the President, said claimant may institute a suit * * * " to establish his interest or ownership in the seized property.

In Panatech Corp. v. Carl Zeiss, Inc., 110 F.Supp. 664, the United States District Court for the Southern District of New York held that this provision in Section 9 of the Act precluded the maintenance of such an action prior to the required notice of such a claim. In Becker Steel Co. of America v. Cummings, 296 U.S. 74, 79, 56 S.Ct. 15, 80 L.Ed. 54, the remedy under Section 9(a) was said to be the only remedy of the nonenemy owner of property seized under the Act.

■ ■ The action here was against the Attorney General to secure from him property which he was holding as custodian for the United States. The action was, therefore, an action against the United States and could be filed and maintained only by complying with the conditions prescribed by Congress in the Mellon Act. In Bartlesville Zinc Co. v. Mellon, 7 Cir., 56 F.2d 154, 155, this court said of an action against the Government: "* * * Suitors may not bring actions against the United States without the latter's consent, and the limitations placed upon such permission [there that the action should not be brought later than two years after the passage of the law] are not mere statutes of limitation, but conditions precedent to the right to sue. After the expiration of the two-year period, plaintiff had no consent to sue, and the court no jurisdiction to entertain its complaint. [Citations.]" See also Bryan v. United States, 10 Cir., 99 F.2d 549, 552. Since the plaintiff here failed to give the required notice of his claim, the District Court had no alternative but to dismiss the action.

The judgment is

Affirmed.