**KERMATH MANUFACTURING COMPANY, Appellant,**

v.

**Herbert BROWNELL, Jr., Attorney General, Successor to the Alien Property Custodian, Appellee.**

No. 12292.

United States Court of Appeals Sixth Circuit.

June 7, 1955.

**578**

Nancy Jean Ringland, Washington, D. C., argued, Frank W. Donovan, Goddard, McClintock, Fulton & Donovan, Detroit, Mich., on the brief, for appellant.

George B. Searls, Washington D. C., argued, Dallas S. Townsend, Asst. Atty. Gen., James D. Hill, George B. Searls, Rollins M. Koppel, Washington, D. C., Fred W. Kaess, U. S. Atty., Detroit, Mich., on the brief, for appellee.

Before SIMONS, Chief Judge, ALLEN and MILLER, Circuit Judges.

SIMONS, Chief Judge.

The situation disclosed in the above appeal is not only novel, but in some respects fantastic. The appellant resists the capture by the Attorney General in his capacity as Alien Property Custodian, under the authority of the Trading With the Enemy Act, as amended, 40 Stat. 411, 50 U.S.C.A.Appendix, § 1 et seq., of a debt owing by the appellant to a Japanese national, and boldly proclaims its participation in a fraud upon the Japanese Government and the financial institutions through which the transaction was handled, asserting that the deceit succeeded only through its own complete and active participation. The facts are not in dispute and their recital follows.

Kermath is a Michigan corporation engaged in the production of marine engines, their parts and accessories. Motor Boat Company, Ltd. is an organization under the laws of Japan with its principal place of business in Tokyo. It was the distributor for Kermath's products in Japan. In 1938, it purchased from Kermath fifty Diesel engines to fill an order in Japan. It is assumed that the ultimate purchaser was a department of the Japanese Government. Payment was made to Kermath by means of letters of credit obtained by Motor Boat from the One Hundredth Bank of Japan and forwarded to the Chase National Bank in New York City. The total amount of these letters of credit exceeded by $61,687.25 the price of the engines and parts quoted by Kermath to Motor Boat. By pre-arrangement with Motor Boat, Kermath submitted to the Chase National Bank invoices exceeding the actual price, to effect release of all the funds held by the Chase Bank, and, at the same time, provided Motor Boat with two sets of invoices,—one for the increased price, the other for the actual price quoted. It furnished to Motor Boat an acknowledged certification that Motor Boat had with it a credit of $61,687.25 in United States dollars, arising from shipments for its account under the letters of credit.

In August, 1939, upon written instructions from Motor Boat, dated July 22nd, Kermath paid the sum of $687.25 to a representative of Motor Boat and debited this payment against the credit balance, reducing it to $61,000.00. In July, 1939, Motor Boat had tried to effect a transfer of this amount to a Holland bank. Before it would release the fund, Kermath demanded sworn documents to show its unwillingness to violate foreign exchange regulations of Japan, that Motor Boat had not in any way used the invoices to effectuate any violation of Jap-

anese laws and that the buyer had been fully informed of the actual price paid or to be paid to Kermath. Shortly thereafter, war broke out in Europe and, as a result, Motor Boat informed Kermath that it was inadvisable to transfer the fund to Holland at that time. Thus stood the situation at the outbreak of our war with Japan.

On August 5, 1942, Kermath reported to the Secretary of the Treasury that it had a credit balance in favor of Motor Boat, Ltd. in the amount of $61,000.00 and that its relationship to Motor Boat was that of "debtor." In explanation of the credit, Kermath in November, 1943, informed the Custodian, generally, of the manner in which the credit balance had arisen. In July, 1948, Kermath again reported to the Custodian that it held a credit balance payable to Motor Boat. Three months later, the Attorney General, acting under the authority of § 17 of the Trading With the Enemy Act, issued a vesting order, vesting the credit balance in him, as Alien Property Custodian, and on August 14, 1950 brought suit in the District Court to compel compliance with such order. Kermath answered, and pleaded the Statute of Limitations as a bar to the action. Later, in an amended answer, Kermath asserted two other affirmative defenses: (1) that the credit balance was held by it upon an understanding that it would be used by Motor Boat for the purchase of additional merchandise which would bring a profit of $12,000.00 and that it was entitled to that sum by way of counterclaim, (2) that the credit balance arose as the result of a contract with Motor Boat which was illegal and void under both the laws of Michigan and Japan. The last defense is the basis of this appeal, the others being abandoned at the trial as having, in fact, no substance.

The District Court gave judgment for the Custodian, 120 F.Supp. 331, holding that § 17 is a summary possessory proceeding in which the Court may compel compliance with the vesting order without first determining the question of ownership and that the defense of illegality was unavailable to Kermath.

The pertinent sections of the Trading With the Enemy Act are 2(a), 7(c), 9(a) and 17. Section 7(c) provides that if the President shall so require any money or other property, including choses in action, and rights and claims of every character and description, owing or belonging to or held for, by, or on account of, or on behalf of, or for the benefit of an enemy, which the President, after investigation shall determine is so owing, or so belongs, or is so held, shall be conveyed, transferred, signed, delivered, or paid over to the Alien Property Custodian, or the same may be seized by him. Section 9(a) provides for a return of money or property erroneously seized. The Supreme Court held in Stoehr v. Wallace, 255 U.S. 239, 245, 41 S.Ct. 293, 296, 65 L.Ed. 604, that the Congress, in time of war, may authorize and provide for seizure through executive agencies of property believed to be enemy owned, if adequate provision be made for a return in case of mistake. Said the Court: "There is no warrant for saying that the enemy ownership must be determined judicially before the property can be seized; and the practice has been the other way." To the same effect is Central Union Trust Company v. Garvan, 254 U.S. 554, 568, 41 S.Ct. 214, 65 L.Ed. 403 and Commercial Trust Company v. Miller, 262 U.S. 51, 56, 43 S.Ct. 486, 67 L. Ed. 858. The basic contention of the appellant is that it owed no debt to Motor Boat because the whole transaction was void because of its illegality, and that this issue must first be determined before compliance with the vesting order is adjudicated.

We pass, without consideration, the subtleties by which the appellant contends that it received nothing from Motor Boat and, so, owed it nothing. In this regard, the facts speak for themselves. We address ourselves to the contention that Motor Boat had no claim because of the illegality of the transaction and that the Attorney General has no basis for his

vesting order because he stands in the shoes of Motor Boat. This all-embracing concept is challenged by authoritative text writers and controlling cases. Williston 5, § 1630; Grismore's Law of Contracts, § 290, Corbin on Contracts, §§ 1465, 1466; Gibbs & Sterrett Manufacturing Co. v. Brucker, 111 U.S. 597, 601, 4 S.Ct. 572, 28 L.Ed. 534; Ewell v. Draggs, 108 U.S. 143, 2 S.Ct. 408, 27 L. Ed. 682. The principle seems to be, as said in Grismore, supra, that: "While it is frequently asserted that an illegal bargain is void, meaning thereby, presumably, that the situation is just as if no contract had been made, this is not strictly so. What the courts really have done, in such cases, in the absence of a statute specifying otherwise, is to take the view merely that the judicial machinery is not available for use to one who has participated in an illegal transaction. * * *" Williston in § 1631 entitles the subject matter "Illustrations of Recovery by Innocent Plaintiffs" and states: "And it is for a similar reason that a party who is chargeable with some knowledge of the facts making the transaction illegal, but is not in pari delicto, is allowed recovery of moneys paid or property transferred." The Attorney General was not a party to the fraud practiced upon the Japanese purchaser. The illegality of the transaction through which the fund sought to be recovered by him came to the hands of Kermath, even though available to Kermath, to defeat a claim by Motor Boat is not available to Kermath as against the Attorney General.

Moreover, it must not be overlooked that the Trading With the Enemy Act was in the exercise of Constitutional sovereign power in time of war. Among its clearly inferred purposes was the protection of American creditors of enemy owned companies and to make certain that enemy assets should not be used to impede or subvert the war effort.[1] In McGrath v. Manufacturers Trust Co., 338 U.S. 241, 246, 70 S.Ct. 4, 7, 94 L.Ed. 31, the Court said: "The Trading with the Enemy Act is a war measure. It creates powerful and swift executive and summary procedures particularly for the seizure of the property of enemies by legal process as an effective alternative to seizure by military force. The Act expressly provides for the seizure of enemy-held claims to money owed on debts." The statutory power vested in the Attorney General, as Custodian, is not wholly unlike that vested even in peace time in some other public agencies. As was said in Agwilines, Inc., v. N. L. R. B., 5 Cir., 87 F.2d 146, 150, in respect to a proceeding under the Wagner Act [29 U.S.C.A. § 151 et seq.], "The proceeding is not, it cannot be made, a private one to enforce a private right. It is a public procedure, looking only to public ends", cited by us in N. L. R. B. v. Thompson Products, Inc., 6 Cir., 130 F.2d 363.

If the foregoing is not enough, we turn again to McGrath v. Manufacturers Trust Co., supra, where, in denying the recovery of interest under the Trading With the Enemy Act, the Court pointed out that the Custodian is not a creditor of the debtor made defendant in a vesting proceeding. It was there said, 338 U.S. at page 248, 70 S.Ct. at page 8: "In the present case, however, we are not dealing with interest accruing to the Government upon contractual indebtedness or upon indebtedness such as that arising out of customs duties or taxes. We have here quite a different matter, the violation of a summary order of the Alien Property Custodian to turn over to him the physical possession of certain funds as a protective war measure."

Simon v. Miller, D.C., 298 F. 520, is strongly urged by Kermath as developing a differing concept but it is clear, from a careful reading of that case, that Judge Learned Hand was concerned with the analogy of a claim arising out of a creditor-debtor relationship and assimilating the status of the Custodian to that of a creditor in a garnishment proceeding. Even so, his observations therein rise no higher than dicta. Finally, it must be observed, as was held in Becker Steel Company v. Cummings, 296 U.S.

1. Ladue & Co. v. Brownell, 7 Cir., 220 F.2d 468.

.. 

74, 79, 56 S.Ct. 15, 18, 80 L.Ed. 54, that in the Trading With the Enemy Act: "Congress did not attempt the confiscation of the property of citizens or alien friends. * * * Instead by section 9(a) it gave to the nonenemy owner the right to maintain a suit for the recovery of the seized property or its proceeds and at the same time, by the all-inclusive language of section 7(c), it denied to him any other remedy."

Affirmed.